IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 39838

| STATE OF IDAHO, | ) | |
|---|---|---|
| | ) | Coeur d'Alene, September 2014 |
| Plaintiff-Respondent, | ) | Term |
| | ) | |
| v. | ) | 2014 Opinion No. 114 |
| | ) | |
| JONATHAN WADE ELLINGTON, | ) | Filed: October 29, 2014 |
| | ) | |
| Defendant-Appellant. | ) | Stephen W. Kenyon, Clerk |
| _____ | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Hon. John P. Luster, District Judge.

The district court's denial of Defendant's motion for new trial is affirmed.

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Erik R. Lehtinen argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Mark W. Olson argued.

_____

J. JONES, Justice

Jonathan Wade Ellington was convicted of second-degree murder and two counts of aggravated battery. Ellington moved for a new trial, arguing that he discovered new material evidence that could not have been produced at trial through reasonable diligence. The evidence consisted of statements in a textbook authored by the State's accident reconstruction expert that, according to Ellington, directly conflicted with the expert's trial testimony. The district court denied Ellington's motion, which he timely appealed.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

On January 1, 2006, Jovon Larsen, then twenty-two, was driving her Honda Accord near

Athol in Kootenai County with her sister, Joleen Larsen, then eighteen, as her only passenger.[1] Sometime around 11:00 a.m., Jon Ellington pulled behind the Honda in his Chevy Blazer. The Larsen sisters claim that Ellington passed them after following "within feet" of their rear bumper and cut them off in the process. Ellington's attorney suggests that Jovon was playing "cat and mouse" with Ellington, adjusting her speed to prevent him from passing the Honda. At the next stop sign, the Larsen sisters were stopped behind the Blazer when Ellington stepped out, walked back to the Honda, swore at the Larsen sisters, and struck the driver's side window with his fist.

As Ellington returned to the Blazer, Joleen called 911. Ellington turned at the stop sign and Jovon followed because, she claims, Ellington's vehicle did not have a license plate and she wanted to assist the police in locating Ellington. Shortly thereafter, the Larsen sisters lost track of Ellington and, following the advice of the 911 operator,[2] pulled over to wait for an officer. Joleen then called her parents, Joel and Vonette Larsen, who arrived roughly ten minutes later. An officer with the sheriff's department arrived shortly after Joel and Vonette, spoke with the Larsen sisters, and left to investigate. Just after the officer left, Joel, Vonette, and the Larsen sisters saw the Blazer pull out of a nearby driveway. Back in the Honda, Joleen called 911 and Jovon resumed the pursuit of Ellington. Joel and Vonette joined the pursuit in the Subaru. The vehicles were travelling at speeds in excess of ninety miles per hour, with the Blazer leading and the Subaru bringing up the rear.

Heading west on Scarcello Road, Ellington made a left-hand turn into a driveway, apparently attempting to reverse direction and drive east. As Ellington pulled into the driveway, the Larsen sisters stopped in the westbound lane of traffic. The State presented evidence that the Honda was angled slightly towards the eastbound lane, with the front, driver's side tire near the double yellow lines of Scarcello Road. Vonette passed the Honda in the eastbound lane, partially blocking that lane of traffic. When Ellington backed out of the driveway and attempted to proceed east on Scarcello Road, the front, driver's side corner of the Subaru collided with the Blazer near its driver's side door.

---

[1] Ellington did not testify at trial. As a result, much of the factual record regarding the events of January 1, 2006, consists of testimony by the Larsen sisters and their father, Joel Larsen.

[2] The 911 operator advised more than once that the investigation and pursuit of Ellington should be handled by police officers. This was exceedingly well-founded advice. The tragic events in this case might have been averted had the advice been followed. This in no way excuses Ellington's subsequent actions but merely recognizes that trained police officers, rather than average citizens, can best handle the pursuit of those suspected of criminal activity.

The Blazer moved around the Subaru, proceeded left towards the westbound lane, and collided head-on with the Honda. The Blazer pushed the Honda back onto the shoulder of the road. The State's accident reconstruction expert testified that Ellington was turning left, into the Honda, and fully accelerating as he pushed the Honda to the edge of the road.

Joel and Vonette left the Subaru and headed towards the collision, with Joel carrying a .44 magnum revolver he retrieved from under the passenger seat of the Subaru. As Joel approached the passenger-side window of the Blazer, Ellington was reversing and pulling away from the Honda. According to Joel, he leveled his revolver at Ellington directly outside the passenger window, but did not fire out of concern that he might hit one of the Larsen sisters. Instead, Joel claims, he fired once at the front of the Blazer, just above the passenger-side wheel well, in an apparent attempt to disable the engine and out of concern that Vonette may have been in the Blazer's path. Joel claims that he only later—as the Blazer was leaving the scene—emptied the remaining rounds in his revolver, hitting the Blazer once more in the rear, passenger-side window. Ellington's attorney suggested that Joel may have fired the round that hit the rear window as Joel approached the Blazer while it was still engaged with the Honda.

As Ellington disengaged from the Honda and reversed to pull around it, Vonette was crossing Scarcello Road in front of both vehicles. The State's accident reconstruction expert testified that as Ellington accelerated around the Honda, he turned to the left into the westbound lane, towards Vonette, though he could have left the scene in the unoccupied, eastbound lane of Scarcello Road. Both Joel and Jovon testified that Vonette was just inside of the westbound lane as the Blazer accelerated towards her, struck her near the center of the Blazer's hood, and drove over her. The State offered the testimony of a medical examiner who stated that Vonette's injuries were consistent with Joel and Jovon's testimony. Ellington's attorney suggested, instead, that the Blazer may not have struck Vonette, but that Vonette may have already been on the ground when the Blazer drove over her. Vonette was dead when officers arrived a short time later.

Ellington was arrested later that day and charged with second-degree murder for Vonette's death and two counts of aggravated battery for colliding with the Honda. Ellington was convicted on all counts in 2006.

Following his conviction, Ellington moved for a new trial on a variety of grounds, including that he discovered new, material evidence which could not have been produced at trial

through reasonable diligence and which would probably result in his acquittal. The district court denied Ellington's motion. With respect to Ellington's argument concerning newly discovered evidence, the district court held that the new evidence was not material and would probably not produce an acquittal. Ellington appealed and this Court reversed the district court, finding that the State's accident reconstruction expert, Cpl. Fred Rice, an Idaho State Police officer, had presented perjured testimony, which was only discovered after the trial. *State v. Ellington* (*Ellington I*), 151 Idaho 53, 71–76, 253 P.3d 727, 745–750 (2011). We vacated Ellington's convictions and remanded the case for a new trial. *Id.* at 76, 253 P.3d at 750.

At Ellington's second trial, the State emphasized two choices that were allegedly made by Ellington. First, the State argued that after the collision between the Subaru and the Blazer, Ellington chose to turn the Blazer to the left—into the westbound lane of Scarcello Road—to collide with the Honda. Second, the State argued that after disengaging with the Honda, Ellington chose to turn the Blazer left again—into the westbound lane of Scarcello Road—to strike Vonette. In both cases, according to the State, Ellington could have elected to use the unoccupied, eastbound lane of Scarcello Road to avoid the collisions.

In opening arguments, Ellington's attorney suggested that Ellington did not turn the Blazer in the direction of the Honda, but was rotated by the collision with the Subaru so that the Honda was in the Blazer's path. Ellington did not present evidence at trial to support this view, though he did retain an accident reconstruction expert—David W. Rochford—and Rochford authored a report prior to trial which stated, in part, that the collision with the Subaru caused the Blazer "to rotate counterclockwise in the approximate direction of the Honda." Neither Rochford nor any other expert was called by the defense to testify, however.

To support its claim that Ellington turned the Blazer in the direction of the Honda, the State offered the testimony of an accident reconstruction expert—John Daily. Daily authored a report focusing on the extent to which the collision with the Subaru might have rotated the Blazer. He stated "[t]he supposition that the Subaru impacted the Blazer with enough force to cause it to change direction to point toward the Honda is not supported either by the physical evidence or by analysis." Daily used rotational mechanics to calculate the force that would have been required to rotate the Blazer 45°—the rotation Daily claims would have been required to place the Honda in the Blazer's path without any steering input from Ellington. The report

includes a series of calculations making use of a particular formula[3] and purporting to show that the Subaru's Δv, or "speed change," would have to have been 41.8 m.p.h. to rotate the Blazer 45°. The report concludes that a collision involving such a speed change would have caused significantly more damage to the Subaru and Blazer than was in fact caused to the vehicles and would have significantly displaced the Subaru. Daily's testimony at trial as to the collision between the Blazer and the Subaru was consistent with the views he expressed in his report.

Approximately three weeks after Ellington's trial ended, Rochford secured a copy of a textbook co-authored by Daily. Ellington and Rochford contend that a particular passage from Daily's textbook contradicts Daily's testimony with respect to the extent to which the Blazer might have been rotated as a result of its collision with the Subaru. The alleged inconsistency involves the calculation Daily performed to determine the speed change on the part of the Subaru required to produce a 45° rotation in the Blazer. Just after Daily's textbook demonstrates a particular type of analysis, the following paragraph appears:

> The analysis just presented was for a perpendicular crash. If the striking vehicle comes in at an angle different than 90°, then the force acting to create the torque must be adjusted by a factor defined as the sine of the angle of incidence. As the angle gets more shallow (i.e., closer to zero), then the solution becomes very sensitive to the angle and the presence of ground forces. It is recommended not to attempt this type of analysis for collisions that are less than 45°.

Daily acknowledges that the angle of impact between the Subaru and the Blazer was less than 45°. As a result, Ellington claims, Daily's calculation was mistaken and the jury was misled regarding the likely results of the impact between the Subaru and the Blazer. According to Ellington, if the jury had been aware that Daily used the wrong formula in his calculation, it might have concluded, first, that there was inadequate reason to believe that Ellington turned the Blazer into the Honda and, second, that there was inadequate reason to believe that Ellington had the malice required to support a second-degree murder conviction.

Ellington moved for a new trial pursuant to I.C.R. 34 and Idaho Code section 19-2406(7), claiming that the formula and commentary disclosed in the textbook constituted newly discovered evidence that could not have been produced at trial through reasonable diligence and

---

[3] The formula Daily testified about at trial was not included in his initial report. It first appeared in a supplemental report, which Ellington's counsel received at the time jury selection began. However, Ellington's counsel did not seek a continuance, did not object to Daily's testimony regarding the formula or cross-examine him regarding the appropriateness of his use of the formula, did not seek to exclude or strike the testimony, nor did he present testimony of a defense expert to call it into question.

that would probably have resulted in his acquittal. The district court denied Ellington's motion. With respect to Ellington's argument that the passage from Daily's textbook justified a new trial, the district court found that the evidence was not new, was at best impeaching, would not probably result in an acquittal, and could have been produced at trial through reasonable diligence. Ellington timely appealed, claiming that the district court erred in denying his motion for a new trial "where there was newly-discovered evidence showing that the State's retained accident reconstruction expert testified falsely" at the second trial. He claims that the district court misconstrued the nature of the allegedly new evidence and requests that this Court either reverse the district court's order and remand for a new trial or vacate that order and remand for reconsideration. The only issue on appeal is whether the district court abused its discretion when it denied Ellington's motion for a new trial pursuant to I.C.R. 34 and Idaho Code section 19-2406(7).

## II.
## ANALYSIS

### A. Standard of Review

"The denial of a motion for new trial is reviewed for an abuse of discretion." *State v. Stevens*, 146 Idaho 139, 144, 191 P.3d 217, 222 (2008). The standard of review reflects the recognition that:

> the judge who tries the case, having the parties, their witnesses, and counsel before him, with opportunity to observe their demeanor and conduct during the trial, and noting the occurrences during its progress likely to affect the result thereof, is better qualified to judge whether a fair trial has been had and substantial justice done than the appellate court, that has before it merely the written record.

*Findley v. Woodall*, 86 Idaho 439, 446–47, 387 P.2d 594, 598 (1963). Abuse of discretion review involves three questions: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *Cantwell v. City of Boise*, 146 Idaho 127, 133–34, 191 P.3d 205, 211–12 (2008). Because a motion for a new trial based upon newly discovered evidence involves both factual and legal questions, "[a]n abuse of discretion will be found if the trial court's findings of fact are not supported by substantial evidence or if the trial court does not correctly apply the law." *Stevens*, 146 Idaho at 144, 191 P.3d at 222.

6

**B. The district court did not abuse its discretion when it denied Ellington's motion for a new trial pursuant to I.C.R. 34 and Idaho Code section 19-2406(7).**

I.C.R. 34 grants a trial court discretion to order a new trial "if required in the interest of justice," but "I.C. § 19-2406 sets forth the only grounds permitting the grant of a new trial and, therefore, limits the instances in which the trial courts discretion may be exercised." *State v. Cantu*, 129 Idaho 673, 675, 931 P.2d 1191, 1193 (1997). One circumstance in which a court may exercise this discretion is "[w]hen new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial." I.C. § 19-2406(7).

A defendant seeking a new trial on the basis of newly discovered evidence has the burden of showing:

> (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

*State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976).[4] "Motions for a new trial based on newly discovered evidence are disfavored and should be granted with caution, reflecting the importance accorded to considerations of repose, regularity of decision making, and conservation of scarce judicial resources." *Stevens*, 146 Idaho at 144, 191 P.3d at 222.

The district court clearly acknowledged its discretion in denying Ellington's motion for a new trial. It then found that Ellington failed to establish any of the elements of the *Drapeau* standard. The district court's denial of Ellington's motion will be affirmed, however, as long as it did not abuse its discretion with respect to each such element. *See Stevens*, 146 Idaho at 146, 191 P.3d at 224 (declining to consider the district court's determination with respect to the remaining elements of the *Drapeau* standard after holding that the district court did not abuse its discretion in determining that one element was not met). The district court found that Ellington's allegedly new evidence "is at best impeachment evidence that the Defendant could have used during trial to impeach Mr. Daily's use of the rotational mechanics theory." This is "essentially an evidentiary ruling." *Ellington I*, 151 Idaho at 73–74, 253 P.3d at 747–48. "A district court's evidentiary rulings will not be disturbed by this Court unless there has been a clear abuse of

---

[4] Though there are exceptions to the general applicability of the *Drapeau* standard, neither party contends that those exceptions apply here.

7

discretion." *McDaniel v. Inland Nw. Renal Care Grp.-Idaho, LLC*, 144 Idaho 219, 222, 159 P.3d 856, 859 (2007). Because we hold that the district court did not clearly abuse its discretion when it found that Ellington did not establish that his allegedly new evidence was material and not merely impeaching, we need not address the district court's findings with respect to the remaining elements of the *Drapeau* standard.

While substantive evidence is "offered for the purpose of persuading the trier of fact as to the truth of a proposition on which the determination of the tribunal is to be asked," impeachment evidence "is designed to discredit a witness, i.e. to reduce the effectiveness of his testimony by bringing forth the evidence which explains why the jury should not put faith in him or his testimony." *Ellington I*, 151 Idaho at 74, 253 P.3d at 748. Evidence that does both is both substantive and impeaching. *Id.* "Whether a fact is material is determined by its relationship to the legal theories presented by the parties." *Stevens*, 146 Idaho at 143, 191 P.3d at 221. Evidence is material when it has "some logical connection with the consequential facts." *Ellington I*, 151 Idaho at 74, 252 P.3d at 748 (quoting *Black's Law Dictionary* 1066 (9th ed. 2009)).

The district court did not abuse its discretion in finding that Ellington's allegedly new evidence is not material and is at best impeachment evidence. In the first place, Ellington has not shown that the passage from Daily's textbook is addressed to a calculation of the sort Daily performed. In the second place, even if the passage is addressed to such a calculation, the passage would merely provide reason to discount the value of Daily's testimony and would not provide any evidence for or against any proposition advanced by either party.

First, Ellington has not shown—and there is some reason to doubt—that the passage establishes that Daily should not have attempted to calculate the force required to rotate the Blazer 45° in the way that he did. Page 306 of Daily's textbook displays the formula allegedly misused in Daily's calculation. Page 310 includes the statement upon which Ellington relies, "[i]t is recommended not to attempt this type of analysis for collisions that are less than 45°." That page does not explain which type of analysis should not be attempted for collisions in which the angle of impact is less than 45°, however. Pages 306–307 illustrate the use of the formula to calculate the $\Delta v$ of a colliding vehicle from the degree to which the impacted vehicle was rotated by the collision. On page 308, a new section begins—"9.9.3 Computing Impact Speed from $\Delta v$." Neither Ellington nor the State submitted page 309 of the textbook.

The materials provided by Ellington do not establish what type of analysis the textbook

8

recommends not to attempt where the angle of collision is less than 45°. However, the textbook is plausibly read as recommending that one not attempt to calculate the impact speed of a colliding vehicle from the Δv of that vehicle when the angle of impact is less than 45°. That reading is plausible for two reasons. First, the new section that begins on page 308 is explicitly devoted to such an analysis. Second, page 310—the page on which the passage that allegedly casts doubt on Daily's testimony occurs—includes a discussion of the manner in which "tire forces" and "ground forces" affect the calculation of "the impact speed of the striking vehicle."

Daily has consistently stated that his report and testimony did not involve a calculation of the impact speed of the Subaru. In his report, Daily states that he is attempting to calculate:

> the speed change the striking vehicle would have to have in order to spin the rotating vehicle to that angular speed in the collision. *This speed change we calculate is not an impact speed.* Rather, it is the speed change that will provide enough force to rotate the struck vehicle from one angle to another.

(emphasis added). Similarly, in an affidavit submitted in opposition to Ellington's motion for a new trial, Daily states that:

> Mr. Rochford alleges the wrong formula was used to evaluate the impact of the Blazer-Subaru collision. However, Mr. Rochford bases his assessment on a formula used to compute impact speed. He fails to understand that the speed change calculation I made was not of an impact speed. Rather, the calculation is of the speed change that will provide enough force to rotate the vehicle from one angle to another.

Daily variously uses the terms "impact speed," "speed change," "velocity change," and "Δv," but is not as clear as one would hope regarding the distinctions. His report uses "Δv" as a notation representing speed change. Daily also indicated in his testimony that he is using the terms "speed change," "velocity change," and "change in velocity" to be equivalent in meaning. According to Daily, a colliding vehicle's change in velocity is highly correlated with the force of the collision. Where the collision causes the velocity—the speed in a certain direction—of the striking vehicle to change dramatically, the collision will be very forceful. On the other hand, the impact speed of a colliding vehicle may not be well correlated with the force of a collision. A striking vehicle may be moving very quickly, but if the collision involves a very low angle of impact—in a sideswipe collision, for instance—there may well be very little change in velocity and very little force to the collision, despite the high impact speed. Because Daily argues that the degree to which the Blazer was rotated by its collision with the Subaru is a function of the force of that collision, it would seem to be the Subaru's change of velocity, and not its impact speed,

9

that is relevant to that analysis.

Daily purports to be calculating the change in velocity required on the part of the Subaru to rotate the Blazer 45°. The passage on page 310 of Daily's textbook appears to be addressed to a calculation of impact speed. The district court did not abuse its discretion in finding that the statement in Daily's textbook is not material to the issue about which Daily was testifying.

Even if the passage from Daily's textbook demonstrated that his calculation was in error, however, the district court acted within its discretion in finding that the evidence was merely impeaching. Even then, the passage would merely "explain[] why the jury should not put faith in . . . his testimony." *Ellington I*, 151 Idaho at 74, 253 P.3d at 748. It would not "persuad[e] the trier of fact as to the truth of a proposition on which the determination of the tribunal is to be asked . . . ." *Id.*

The contrast with *Ellington I* is instructive. In his first trial, Ellington presented the testimony of an accident reconstruction expert—Dr. William Skelton—who claimed that Ellington did not have time to avoid striking the Honda or Vonette. *Id.* at 71, 253 P.3d at 745. In support of this view, Dr. Skelton testified that the debris field could be used to reconstruct the accident and that the debris field showed that the impact between the Blazer and the Honda occurred in the eastbound lane of traffic. *Id.* In addition, Dr. Skelton testified that the average perception reaction time—the average time it takes a person to perceive, recognize, and react to a hazard—has a certain value and that, given that value, Ellington could not have reacted quickly enough to avoid the collision with the Honda or, later, with Vonette. *Id.* In rebuttal, the State presented the testimony of Cpl. Fred Rice, who testified that there is no such thing as an average perception reaction time and that debris fields are an unreliable means of reconstructing an accident. *Id.* After his first trial, Ellington discovered prior testimony from Cpl. Rice, as well as instructional materials he used in teaching accident reconstruction to police officers, in which he endorsed the usefulness of debris fields in accident reconstruction and employed an average perception reaction time nearly identical to that employed by Dr. Skelton. *Id.* at 71–74, 253 P.3d at 745–48.

In holding that Cpl. Rice's prior testimony was material and not merely impeaching, this Court emphasized that it "would lend more support" for claims that were advanced by Ellington at trial and that formed the core of Ellington's defense. *Id.* at 74, 253 P.3d at 748. The new evidence did not merely call into question the reliability of Cpl. Rice's testimony at Ellington's

first trial, but constituted affirmative evidence in support of Ellington's claims concerning the usefulness of debris fields in accident reconstruction and the value of the average perception reaction time. *Id.* Here, by contrast, the passage in Daily's textbook—even if construed as applying to the type of calculation Daily performed—suggests only that Daily's calculation was unreliable. The passage provides no evidence for or against any proposition advanced by either party at trial. In particular, it tells us nothing at all about whether the Blazer was or was not rotated 45° by its collision with the Subaru.

Though Ellington claims that the passage "could have been offered for the purpose of persuading the trier of fact that it did not take an extraordinarily forceful crash for the Subaru's impact to have caused Mr. Ellington's Blazer to have rotated toward the girls' Honda," he does not explain how the passage might have persuaded the trier of fact of that proposition. The passage suggests that a certain type of analysis becomes unreliable where the angle of impact becomes sufficiently small. It is one thing to say that a conclusion was reached by an unreliable method. It is quite another to say that the conclusion is false. Evidence that the method by which a conclusion was reached is unreliable is not, in general, evidence against that conclusion. If Daily reached his view regarding the force required to rotate the Blazer 45° by an unreliable method, the appropriate reaction is to refuse to put faith in Daily's testimony, not to conclude that it would take relatively little force to rotate the Blazer. Because the passage from Daily's textbook, at best, "explains why the jury should not put faith in him or his testimony," *id.*, the district court did not err in concluding that the evidence was merely impeaching.

### III.
### CONCLUSION

The district court did not abuse its discretion in denying Ellington's motion for a new trial. We affirm.

Chief Justice BURDICK, and Justices EISMANN and HORTON and Justice Pro Tem WALTERS CONCUR.