# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 35617

| | | |
|---|---|---|
| ON REHEARING | ) | |
| -------------------------------------------------------- | ) | |
| STATE OF IDAHO, | ) | Boise, April 2017 Term |
| | ) | |
| Plaintiff-Respondent, | ) | 2017 Opinion No. 79 |
| | ) | |
| v. | ) | Filed: July 3, 2017 |
| | ) | |
| MARK H. LANKFORD, | ) | Karel A. Lehrman, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Idaho County. Hon. John H. Bradbury, District Judge. Hon. James F. Judd, Senior District Judge.

The district court judgment of conviction for murder is <u>vacated</u> and the case is <u>remanded</u> for a new trial.

Eric Fredericksen, State Appellate Public Defender, Boise, for appellant. Shannon N. Romero argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. LaMont Anderson argued.

---

HORTON, Justice.

Mark Henry Lankford (Lankford) appeals from his judgment of conviction after a jury in Idaho County district court found him guilty of two counts of felony murder. Lankford argues that the district court erred in multiple ways and that he is entitled to a new trial. The State argues that Lankford has failed to prove that reversible error was committed by the district court and that Lankford's convictions should be affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lankford and his brother, Bryan Lankford (Bryan), were both convicted and sentenced to death for the 1983 murders of Robert and Cheryl Bravence, who were brutally murdered while camping in the Sheep Creek area of Idaho County. *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989); *State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987). Bryan's death sentence was

1

overturned by the Supreme Court of the United States because the State failed to provide him with notice that the death penalty could be imposed. *Lankford v. Idaho*, 500 U.S. 110, 127 (1991). The Ninth Circuit vacated Lankford's conviction and sentence and ordered the State to re-try Lankford or release him. *Lankford v. Arave*, 468 F.3d 578, 592 (9th Cir. 2006) (finding ineffective assistance of counsel based upon Lankford's attorney requesting a jury instruction that failed to adequately instruct jurors regarding accomplice testimony).

A new trial was held in 2008, and on February 13, 2008, a jury again found Lankford guilty of both murders. Lankford then filed a motion for new trial. In July 2008, Lankford was sentenced to two consecutive fixed life sentences, which he timely appealed. The appeal was suspended until proceedings on Lankford's motions for new trial were decided. On October 7, 2009, the district court denied Lankford's motion for new trial.[1] Lankford filed his Second Motion for a New Trial on October 29, 2009, and on December 6, 2013, that motion was denied as well. Lankford timely appealed from the denial of his motions for new trial. Lankford also filed a pro se Rule 35 motion for correction of an illegal sentence which the district court found to be untimely.[2] On July 25, 2016, this Court released its original decision in this appeal. We thereafter granted the State's petition for rehearing.

## II. ANALYSIS

Lankford advances four primary arguments in support of his claim that the district court erred. These are that the district court: (1) made biased and prejudicial comments during voir dire; (2) provided erroneous and misleading jury instructions; (3) violated Idaho Code section 19-2405; and (4) improperly denied Lankford's pro se Rule 35 motion. In addition to these claimed errors by the district court, Lankford alleges prosecutorial misconduct and that the cumulative effect of the district court's errors and the prosecutor's misconduct warrant a new trial. Lankford's contentions will be discussed in turn.

### A. The district court did not err during voir dire.

Lankford contends that he was denied his right to due process and a fair trial because, during the course of voir dire, the district court advised potential jurors that there had been a previous trial. Lankford argues that this irreparably prejudiced the jury and that a new trial is

---

[1] The Hon. John H. Bradbury presided over the jury trial and decided Lankford's first motion for new trial.
[2] The Hon. James F. Judd presided over the proceedings relating to Lankford's second motion for new trial. Judge Judd decided that motion, as well as Lankford's pro se Rule 35 motion.

warranted. The State responds that Lankford's claim is barred by the invited error doctrine and that Lankford has failed to establish fundamental error.

1. Standard of Review

We review constitutional claims de novo. *State v. Easley*, 156 Idaho 214, 218, 322 P.3d 296, 300 (2014). However, because Lankford did not object to the district court's statements to the jury, he must demonstrate that the district court's actions constituted fundamental error. *State v. Draper*, 151 Idaho 576, 588, 261 P.3d 853, 865 (2011). Fundamental error is error that: "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010).

2. Lankford's claim is not barred by the invited error doctrine.

"The purpose of the invited error doctrine is to prevent a party who caused or played an important role in prompting a trial court to give or not give an instruction from later challenging that decision on appeal." *State v. Blake*, 133 Idaho 237, 240, 985 P.2d 117, 120 (1999). "It has long been the law in Idaho that one may not successfully complain of errors one has acquiesced in or invited. Errors consented to, acquiesced in, or invited are not reversible." *State v. Dunlap*, 155 Idaho 345, 379, 313 P.3d 1, 35 (2013) (internal citations omitted) (quoting *State v. Owsley*, 105 Idaho 836, 838, 673 P.2d 436, 438 (1983)). However, an appellant who did not encourage the district court to offer the specific instructions given, but merely failed to object, is not precluded by the invited error doctrine from raising an issue on appeal. *State v. Adamcik*, 152 Idaho 445, 477, 272 P.3d 417, 449 (2012); *Blake*, 133 Idaho at 240, 985 P.2d at 120.

While the State has presented various transcript excerpts and other evidence which suggest that Lankford explicitly agreed to the district court's voir dire advisement regarding the prior trial, the State ultimately concedes that, although discussed between the parties, "there is nothing in the record explicitly stating what [defense] counsel suggested" the court do to handle the issue of the earlier trial. Because there is no record of explicit suggestion, encouragement, or acquiescence by Lankford regarding the advisement and because a failure to object is not enough to invoke the invited error doctrine, we hold that Lankford's claim is not barred and will consider the underlying claim of fundamental error.

3

3. <u>The district court's advisement about Lankford's prior trial did not constitute fundamental error.</u>

Lankford argues that the district court's statement about a prior trial and appeal is indistinguishable from telling the jury that Lankford had been found guilty and convicted by a previous jury. Indeed, Lankford states "The district court told jurors during voir dire that Mark had previously been tried and convicted of the charged crimes in 1984 . . . ." Lankford then contends that the district court's statement was "inherently prejudicial," "cannot be cured or minimized by a contemporaneous limiting instruction," affected the "base structure" of a constitutional right, and requires that Lankford's "convictions must be vacated." More succinctly stated, Lankford is arguing that the district court's advisement created an implied bias in the jury.

As this Court has noted many times, the right to a fair trial before an impartial jury is fundamental to both the U.S. Constitution and the Idaho Constitution. U.S. Const. amends. VI, XIV; Idaho const. art. 1, sections 7, 13; *see also, e.g.*, *State v. Abdullah*, 158 Idaho 386, 421, 348 P.3d 1, 36 (2014). The Supreme Court of the United States has noted: "It is elementary that a fair trial in a fair tribunal is a basic requirement of due process," *Weiss v. United States*, 510 U.S. 163, 178 (1994); and this Court has stated that the due process requirements of the Idaho Constitution require "a trial by a fair and impartial jury." *State v. Nadlman*, 63 Idaho 153, 163, 118 P.2d 58, 62 (1941). The impartiality of a juror may be challenged for "actual or implied" bias. *United States v. Wood*, 299 U.S. 123, 133 (1936); *Abdullah*, 158 Idaho at 421, 348 P.3d at 36. Actual bias deals with the specific state of mind of an individual juror and is proved by questioning the juror as to whether he or she can serve with entire impartiality. I.C. § 19-2018(2); *Abdullah*, 158 Idaho at 421–22, 348 P.3d at 36–37. Implied bias, however, conclusively presumes bias as a matter of law based on the existence of a specific fact. I.C. § 19-2018(1); *Wood*, 299 U.S. at 133.

Many courts, including the Supreme Court of the United States, have held that the fact that a juror knew that the defendant has been found guilty or convicted by a previous jury for the same crime creates an implied bias and constitutes fundamental error because it is inherently prejudicial. *Leonard v. United States*, 378 U.S. 544, 544 (1964) (per curiam) (recognizing that a jury containing jurors that had previously heard a defendant pronounced guilty in open court on similar charges was "plainly erroneous"); *see also, e.g.*, *Arthur v. Bordenkircher*, 715 F.2d 118, 120 (4th Cir. 1983); *United States v. Williams*, 568 F.2d 464, 470–71 (5th Cir. 1978); *Bailey v. State*, 521 A.2d 1069, 1076 (Del. 1987); *Salas v. People*, 493 P.2d 1356, 1357 (Colo. 1972);

4

*State v. Lee*, 346 So.2d 682, 683–85 (La. 1977); *Weber v. State*, 501 So.2d 1379, 1381–85 (Fla. Dist. Ct. App. 1987). *But see State v. Fraga*, 864 N.W.2d 615, 621–23 (Minn. 2015) (holding that the knowledge of two jurors that defendant was previously convicted for the same charges did not create an implied bias); *People v. Dashnaw*, 116 A.D.3d 1222, 1229–30 (N.Y. App. Div. 2014) (holding that a trial court's statement to potential jurors that the defendant's prior conviction had been reversed did not deprive the defendant of a fair trial where jurors had been repeatedly instructed that they could not consider that fact in their deliberations).

Here, this Court need not decide whether the disclosure of a prior conviction for the same offense would be cause for a finding of implied bias because, despite Lankford's contention otherwise, the district court did not mention a prior conviction or that Lankford was previously found guilty. Rather, the district court stated: "There was a prior trial in Idaho County in 1984 for the offenses for which he is now charged. And an Appeals Court held that Mr. Lankford was not effectively represented and that his trial was therefore unfair."

Idaho law has clearly distinguished between the mention of a previous trial and the mention of a previous conviction. *State v. Watkins*, 152 Idaho 764, 766, 274 P.3d 1279, 1281 (Ct. App. 2012) ("We are not persuaded that [the mention of a prior trial and an appeal] is equivalent to the disclosure that a previous jury had found him guilty."). As our Court of Appeals stated in *Watkins* this distinction has been noted by several other jurisdictions as well. *Id.* at 766–67, 274 P.3d at 1281–82 (citing *inter alia*, *People v. Boose*, 406 N.E.2d 963, 964–66 (Ill. App. Ct. 1980) (holding that a witness' references to defendant's incarceration and appeal were harmless); *Brooks v. State*, 918 So.2d 181, 208 (Fla. 2005) (State's reference to prior trial without disclosing the result was not reversible error); *Brown v. Kentucky*, 313 S.W.3d 577, 607 (Ky. 2010) (holding that a jury's knowledge that defendant was being retried but not that he had been found guilty, did not violate the defendant's rights).

The issue, therefore, is not whether the mention of a prior *conviction* for the same offense creates an inherent, or implied bias, but whether the mention of a prior *trial and appeal* is so extremely and inherently prejudicial that the jury "is not susceptible to rehabilitation through further questioning." *People v. Lefebre*, 5 P.3d 295, 300 (Colo. 2000) (overruled on other grounds by *People v. Novotny*, 320 P.3d 1194 (Colo. 2014)); *State v. Brown*, 732 N.W.2d 625, 629 n.2 (Minn. 2007); *see also Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (noting that implied bias is reserved only for extreme cases). We hold that it is not.

5

Idaho Code section 19-2020 allows for a challenge for implied bias for any one of nine causes and "for no other." I.C. § 19-2020 ("Grounds of challenge for implied bias. — A challenge for implied bias may be taken for all or any of the following causes and for no other: [listing nine causes]."). This Court has been invited on numerous occasions to expand the scope of section 19-2020 to include other grounds for finding implied bias; however, this Court has consistently declined to do so. *See, e.g.*, *State v. Luke*, 134 Idaho 294, 299, 1 P.3d 795, 800 (2000) (declining to extend implied bias to jailor/prisoner relationship); *State v. Cypher*, 92 Idaho 159, 167–68, 438 P.2d 904, 912–13 (1968) (declining to extend implied bias to attorney/client relationship between juror and attorney); *State v. Major*, 105 Idaho 4, 7–8, 665 P.2d 703, 706–07 (1983) (same). Such an approach is not only in line with our own jurisprudence, *see, e.g.*, *State v. Gordon*, 5 Idaho 297, 299, 48 P. 1061, 1062 (1897) ("Our statutes [] specify nine separate grounds upon which a challenge for implied bias may be predicated . . . . We cannot understand why a rule so long established, and which should be familiar to everyone . . . is so uniformly ignored."); *Luke*, 134 Idaho at 299, 1 P.3d at 800 ("Because the legislature saw fit to include the language 'and for no other' we will not extend the statute to situations that are analogous, but not specifically mentioned." (quoting *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct. App. 1993)), but is also in line with decisions from the Supreme Court of the United States. *See, e.g.*, *Dennis v. United States*, 399 U.S. 162, 167 (1950) (declining to find implied bias where the plaintiff was the State and jurors were government employees); *Chandler v. Florida*, 449 U.S. 560, 581 (declining to find bias without a showing of actual bias). Indeed, the Supreme Court has noted that the "long held . . . remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove *actual* bias." *Phillips*, 455 U.S. at 215 (emphasis added). Implied bias is reserved only for extreme cases. *Id.* at 222 (O'Connor, J., concurring) ("While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias."); *Hunley v. Godinez*, 975 F.2d 316, 318 (7th Cir. 1992) ("Use of the "implied bias" doctrine is certainly the rare exception."); *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990) (asking whether "this is one of those extreme situations" that allow a finding of implied bias (internal quotation marks omitted)); *Fraga*, 864 N.W.2d at 622 (Minn. 2015) ("Other courts have found implied bias in extreme situations . . . .").

In determining whether an "extreme situation" exists each case must turn on its own facts. Here, there are three specific reasons why the advisement of the district court about Lankford's previous trial and conviction is not such a situation:

    a. <u>The district court did not reveal the outcome of Lankford's previous trial but only stated that there had been a previous trial and appeal.</u>

As noted earlier, there is a clear distinction between a reference to a previous trial and a previous conviction. While the mention of a previous conviction is certainly very damaging, *see, e.g.*, *Arthur*, 715 F.2d at 119 ("[W]e are hard pressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." (quoting *United States v. Williams*, 568 F.2d 464, 471 (5th Cir. 1978)), the fact that the jury is aware that a defendant is facing trial for a second time simply does not carry the same weight. *Watkins*, 152 Idaho at 766, 274 P.3d at 1281 ("We are not persuaded that this is equivalent to the disclosure that a previous jury had found him guilty."). The fact that a defendant is being retried, without reference to a defendant's conviction or guilt, is no more prejudicial than the fact that the defendant has been held to answer to a criminal charge. Such prejudice is not a basis for relief because it is neither extreme nor unfair, but rather is an inevitable part of the criminal process. *Brown*, 313 S.W.3d at 607 ("[T]he fact that the jury may have been aware that [the defendant] was being retried no more infringed upon his right to be presumed innocent than does the jury's awareness that the defendant was arrested, indicted, and put on trial.").

This is particularly true in this case where the fact of Lankford's retrial was inevitably going to come to the jury's attention. In the twenty-five year period between Lankford's original trial and the retrial, various witnesses had died and as a result their testimony from the previous trial was read into the record. Additionally, all the evidence used in the retrial was still marked with the exhibit stickers from the previous trial. Further, Lankford's own witnesses referred to the prior trial and Lankford's counsel stated during cross-examination of Robert Lankford that: "And it's -- maybe at Mark's prior trial, right, you might have seen him there." Thus, even absent the trial judge's advisement, the jury was sure to have realized that Lankford had been previously tried. Such a consequence is inherently part of the criminal process and cannot be deemed extreme or unreasonable.

    b. <u>There was discussion between counsel and the Court about how to handle the issue of the previous trial and defense counsel did not object at the time the Court made the statement.</u>

If Lankford's counsel had wished to ensure that the jury did not hear from the court or the parties that there had been a previous trial, they could have requested that the court not mention the trial and objected to any such mention. They did not.

Indeed, in a pretrial hearing the district court specifically discussed mentioning the previous trial during voir dire with counsel and explicitly invited defense counsel to provide advice on how to handle the fact of the previous trial. Defense counsel recognized the importance of the issue and stated that they had discussed mentioning the previous trial during voir dire as "a potential strategy." Ultimately the court told defense counsel: "I'm not going to cover it until you signal to me what your approach is going to be on it." Thus, defense counsel had ample opportunity to address the issue in advance of trial and request that the previous trial not be mentioned. Furthermore, defense counsel questioned potential jurors "about the fact that they'll be referring at times to prior hearings and prior trial."

There is "a strong presumption 'that counsel made all significant decisions in the exercise of reasonable professional judgment.' " *State v. Abdullah*, 158 Idaho 386, 418, 348 P.3d 1, 33 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011)). Thus, given the multiple opportunities for defense counsel to inform the district court as to how they wanted the fact of a previous trial handled, it is almost certain that the decision to not object to the advisement was strategic. Such "decisions are 'virtually unchallengeable . . . .' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984)). Under these circumstances, the advisement does not constitute the extreme situation that requires a finding of implied bias.

    c.  <u>The court properly questioned the jurors whether their knowledge of the previous trial would cause them to have actual bias against Lankford and properly instructed the jurors that they must presume Lankford innocent regardless of his prior trial.</u>

As noted previously, the Supreme Court of the United States has stated that the "long held . . . remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Phillips*, 455 U.S. at 215. Here, the district court, immediately after advising the potential jurors of the previous trial, specifically questioned their ability to be impartial: "[I]s there anyone here who thinks he or she would not be able to judge the charges against Mr. Lankford because of the earlier trial that Mr. Lankford went through?" Moreover, at that same time, the district court also specifically instructed the jurors that:

> As jurors you are not to consider the earlier trial and deliberate whether or not Mr. Lankford is guilty. In other words, you must presume him to be innocent and

judge the charges against him solely on the evidence that is presented during this trial without considering in any manner his earlier trial.

We presume that "the jury followed the jury instructions given by the trial court in reaching its verdict," *Abdullah*, 158 Idaho at 445, 348 P.3d at 60, and that, "[a]lthough not always dispositive, the court is entitled to rely on assurances from venire persons concerning partiality or bias." *State v. Hairston*, 133 Idaho 496, 506, 998 P.2d 1170, 1180 (1999). Consequently, any effect of the jury's awareness of the previous trial was properly addressed by the district court's questioning and instruction.

Therefore, given the specific facts of this case, specifically that the court did not mention Lankford's previous finding of guilt or conviction; that the fact of a previous trial inevitably was going to come to the jury's attention; that defense counsel clearly had multiple opportunities to object to the advisement and did not do so; and that the district court properly guarded against actual bias by questioning and instructing the jurors, we hold that this is not the "extreme situation" that would require this Court to depart from our previous decisions denying the expansion of implied bias. Accordingly, we hold that the district court's advisement of Lankford's previous trial and appeal did not create an implied bias.

## B. The district court did not err in its jury instructions.

Lankford contends that the district court committed reversible error by providing the jury with improper and ambiguous jury instructions regarding the legal requirements necessary to find Lankford guilty of felony murder. Lankford argues that the court did not explicitly instruct the jurors that they had to find that Lankford formed an independent intent to rob the Bravences before they were killed as a prerequisite to convicting him of felony murder. Lankford acknowledges that counsel failed to object to the instructions at trial but argues that the errors in the jury instructions constitute fundamental error because they relieved the State of its burden to prove beyond a reasonable doubt that Lankford formed the intent to commit robbery before the Bravences were killed.

1. Standard of Review

"Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Humpherys*, 134 Idaho 657, 659, 8 P.3d 652, 654 (2000). Additionally, "[T]he correctness of a jury instruction depends on whether there is evidence to support the instruction." *State v. Draper*, 151 Idaho 576, 588, 261 P.3d 853, 865 (2011). When considering whether the jury was properly

9

instructed, "[w]e look at the jury instructions as a whole, not individually . . . ." *Id.* Finally, "[a]n erroneous instruction will not constitute reversible error unless the instructions as a whole misled the jury or prejudiced a party." *Id.*

When a party fails to object to jury instructions this Court reviews the instructions for fundamental error. *Id.* Fundamental error is an error that "so profoundly distorts the trial that it produces manifest injustice and deprives the accused of his fundamental right to due process." *State v. Lavy*, 121 Idaho 842, 844, 828 P.2d 871, 873 (1992). In *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010), this Court stated that in order to constitute fundamental error the defendant must show that the error: "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." In addition, this Court has held that errors in jury instructions are fundamental if the error functions to "relieve[] the State of its duty to prove all elements of the charges beyond a reasonable doubt." *Draper*, 151 Idaho at 588, 261 P.3d at 865; *see also State v. Anderson*, 144 Idaho 743, 749, 170 P.3d 886, 892 (2007) ("The United States Supreme Court has held that in criminal trials 'the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.' " (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004))).

2. The district court's jury instructions did not constitute error.

Lankford is correct in asserting that to be guilty of felony murder Lankford must have individually formed the intent to rob the Bravences before they were killed. *State v. Pina*, 149 Idaho 140, 147, 233 P.3d 71, 78 (2010) ("Idaho's felony murder rule requires a finding that each participant had the specific intent to commit the underlying felony."). It is equally true that Lankford could not be guilty of felony murder if he was an accessory after the fact. *State v. Cheatham*, 134 Idaho 565, 571, 6 P.3d 815, 821 (2000) ("The general rationale behind the felony murder rule is that the intent to commit the felony substitutes for the malice requirement. Where the intent to commit the felony does not arise until after the homicide has occurred, the rationale behind the rule no longer applies."). Thus, if the district court relieved the State of having to prove that Lankford had the intent to commit robbery before the Bravences were killed, or instructed the jury that they could find Lankford guilty even if he was only an accessory after the

10

fact, then the instructions constituted fundamental error. *Draper*, 151 Idaho at 588, 261 P.3d at 865.

Here, the district court correctly instructed the jury. Jury Instruction No. 11 clearly states that to find Lankford guilty of first degree murder the state must prove that Lankford "was a principal to or aided and abetted in the commission of a robbery during which an unlawful killing of Robert [and Cheryl] Bravence occurred." Jury Instruction 12 explicitly states:

> In order to find Mark Lankford guilty of Murder in the First Degree, you must first find the following beyond a reasonable doubt:
> 1. Mark Lankford *intended* to commit the act of robbery against the persons of Robert and/or Cheryl Bravence;
> 2. Mark Lankford *formed the intent* to commit the act of robbery *prior* to the commission of the homicide(s).
>
> If you cannot find both of the above elements are true beyond a reasonable doubt, you must find Mark Lankford not guilty of Murder in the First Degree.

Jury Instructions 13–19 then explain the elements necessary for the commission of robbery and instruct on the meaning of perpetration and aiding and abetting. Jury Instruction 19A gives the definition of accessory after the fact:

> Idaho law defines "Accessories" as persons who, having knowledge that a felony has been committed, unlawfully conceal it from a peace officer, or harbor and protect the person charged with or convicted thereof.
>
> Should you conclude that the defendant, Mark Henry Lankford, was merely an accessory after the fact, rather than a principal to the murders of Robert Bravence and/or Cheryl Bravence, *you must acquit him of the respective count(s) for which he is now charged*.

Taken as a whole, these instructions clearly state that Lankford could not be found guilty of felony murder without: (1) committing robbery against the Bravences; and (2) forming the intent "to commit the act of robbery against the persons of Robert and/or Cheryl Bravence . . . prior to the commission of the homicide(s)." Further, Jury Instruction 19A makes it categorically clear that if the jury believed Lankford's version of events and found that he was only an accessory after the fact they "must acquit him of the respective count(s) for which he is now charged."

Lankford attempts to make much of a colloquy that took place during the defense's closing argument to support his claim that that district court erred and that the jury instructions were ambiguous and misleading. The exchange is as follows:

> Defense Counsel: [Jury Instruction No. 13] says, on or about June 21st, in the State of Idaho, Robert and Cheryl Bravence had possession of personal property

which Mark Henry Lankford took from their person or immediate possession against their will. And this is the reason you can't rob a dead person –

Prosecutor: Your honor, I object. I don't think that is a correct statement of the law.

The Court: I don't either. Well, ladies and gentlemen, I've instructed you on the law, so go to my instructions and refer to that.

Lankford argues that, by agreeing with the prosecutor, the district court erroneously implied that "as a matter of law, you can rob a dead person," and as a result, even if the jurors believed that Lankford did not do anything but help conceal the bodies and take property from the Bravences after Bryan killed them, Lankford's own testimony about what happened would have required the jury to find Lankford guilty of robbery and thus felony murder.[3]

Idaho follows the "stream of events" theory. *See, e.g.*, *State v. McLeskey*, 138 Idaho 691, 697–98, 63 P.3d 111, 117–18 (2003). Under this theory, a defendant is guilty of felony murder as long as the defendant formed the intent to commit the robbery before the victim died, whether the victim's personal property is taken before or after the death occurs is immaterial. *See State v. Fetterly*, 109 Idaho 766, 771–72, 710 P.2d 1202, 1207–08 (1986) (holding that a burglary continued after the victim was killed and until the victim's possessions were removed from the home). Thus, while defendants cannot commit robbery by taking the personal property of people who were already dead when the defendant found them, defendants can commit robbery by forming the intent to commit robbery before the victim is killed and then taking the victim's personal property after the death. Thus, because the element of robbery that requires that the defendant "take personal property in the possession of another" can occur after the victim has died, it is not incorrect to state that "you can rob a dead person." Further, any ambiguity that may have arisen from the colloquy was ameliorated by the district court's direction to "go to my instructions and refer to that," because the jury instructions clearly stated that to find Lankford guilty the jury had to find that Lankford formed the intent to rob the Bravences before their deaths and that, if the jury found that Lankford was only an accessory after the fact, they "must acquit him."

Therefore, because the district court did not misstate the law and because the jury instructions clearly state that Lankford had to form the intent to commit robbery before the

---

[3] Lankford testified that Bryan, not Lankford, formed the intent to steal the Bravences' van; that Lankford left the campsite; that Bryan proceeded to rob and murder the Bravences on his own; and Lankford helped Bryan conceal the bodies only after Bryan had committed the robbery and murders.

Bravences' deaths and that Lankford could not be convicted if he was merely an accessory after the fact, the jury instructions did not "relieve[] the State of its duty to prove all elements of the charges beyond a reasonable doubt." *Draper*, 151 Idaho at 588, 261 P.3d at 865. Thus, the first *Perry* prong—that one or more of the defendant's unwaived constitutional rights be violated—has not been met. Because we find no error in the district court's instructions we do not reach the issue of invited error.

**C. The district court did not err by denying Lankford's request for a new trial based on the provisions of Idaho Code section 19-2405.**

Lankford argues that the district court erred when it denied his motion for a new trial based on violations of Idaho Code section 19-2405. Lankford makes two arguments in this regard: (1) the plain language of section 19-2405 stating that "all testimony must be produced anew" explicitly disallows the use of prior sworn testimony from a previous trial; and (2) language in section 19-2405 stating that "the former verdict cannot be used or referred to either in evidence or in argument" specifically prevented the district court from mentioning that there had been a previous trial.

1.  Standard of Review

Generally, "[t]he denial of a motion for new trial is reviewed for an abuse of discretion." *State v. Stevens*, 146 Idaho 139, 144, 191 P.3d 217, 222 (2008). This Court applies a three-part test when evaluating discretionary decisions of the trial court. We consider "(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of this discretion and consistent with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." *Fox v. Mountain West Elec., Inc.*, 137 Idaho 703, 711, 52 P.3d 848, 856 (2002).

This case presents somewhat of an exception to the standard of review which we traditionally apply to decisions on a motion for new trial. Here, Judge Judd, who presided over the proceedings for new trial, was not the judge who heard the evidence presented at trial. Judge Judd did preside over a three-day evidentiary hearing on the second motion for new trial. Thus, we defer to his factual findings based upon the evidence presented to him. This reflects the deference that we traditionally accord factual findings in light of "the trial judge's special opportunity to assess and weigh the credibility of the witnesses who appear." *State v. Tierney*, 109 Idaho 474, 476, 708 P.2d 879, 881 (1985).

Such deference does not, however, extend to the district court's evaluation of the evidence presented in earlier proceedings, as Judge Judd relied on the same record as is before this Court. "[W]here a motion for a new trial is heard and passed upon by a judge who did not preside at the trial of the case, and an appeal is taken . . . the appellate court must 'examine and weigh the evidence the same as the *nisi prius* court should do.' " *Shabinaw v. Brown*, 131 Idaho 747, 750–51, 963 P.2d 1184, 1187–88 (1998) (quoting *Van Camp v. Emery*, 13 Idaho 202, 207, 89 P. 752, 754 (1907)). "Under these limited circumstances, this Court has determined that its role on appeal is to freely review the evidence and weigh the evidence in the same manner as the trial court would do when ruling on a motion for new trial." *Id.* at 751, 963 P.2d at 1188 (citing *Nafus v. Campbell*, 96 Idaho 366, 368, 529 P.2d 266, 268 (1974)).

"This Court reviews questions of law de novo." *State, Dep't of Health & Welfare v. Housel*, 140 Idaho 96, 100, 90 P.3d 321, 325 (2004). "The interpretation of a statute is a question of law over which this Court exercises free review." *State v. Herren*, 157 Idaho 722, 725, 339 P.3d 1126, 1129 (2014).

    2. <u>Whether Idaho Code section 19-2405 allows the use of sworn testimony from a previous trial</u>

Idaho Code section 19-2405 provides:

> The granting of a new trial places the parties in the same position as if no trial had been had. All the testimony must be produced anew, and the former verdict can not be used or referred to either in evidence or in argument.

Lankford argues that the phrase "all testimony must be produced anew" requires that testimony in the new trial must be submitted by live witnesses and not by transcripts from the first trial. This is true, Lankford contends, even if the witnesses are unavailable. In support of this argument Lankford relies on a Montana case, *State ex rel. Mazurek v. District Court of Twentieth Judicial Dist.*, 22 P.3d 166, 169 (Mont. 2000), and an Oklahoma statute, 22 OKLA. STAT. ANN. § 951(A). Lankford's reliance is misplaced.

This Court has consistently and clearly held that only the Idaho Rules of Evidence, as promulgated by this Court, determine the admissibility of evidence. *See* I.R.E. 1102 ("Statutory provisions and rules governing the admissibility of evidence, to the extent they are evidentiary and to the extent that they are in conflict with applicable rules of Idaho Rules of Evidence, are of no force or effect."); *State v. Lopez-Orozco*, 159 Idaho 375, 382, 360 P.3d 1056, 1063 (2015) ("[A]ny statute pertaining to the admission of evidence is of no force or effect where an Idaho

14

Rule of Evidence covers the same subject matter."); *State v. Zimmerman*, 121 Idaho 971, 974, 829 P.2d 861, 864 (1992) ("[T]o the extent that this statute attempts to prescribe the admissibility of hearsay evidence . . . it is of no force or effect."). Thus, in determining whether the phrase "all testimony must be produced anew" precludes the use of prior sworn testimony from unavailable witnesses, Lankford should have first looked to the Idaho Rules of Evidence rather than the jurisprudence of sister states.

Under the Idaho Rules of Evidence, prior testimony of an unavailable declarant is admissible if (1) it is relevant, and (2) it comports with the requirements of Idaho Rule of Evidence 804(b)(1). Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. Under Idaho Rule of Evidence 804, prior testimony is admissible when: (1) the declarant is unavailable as a witness and (2) the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony. A declarant is unavailable when, among other things, he or she is "unable to be present or to testify at the hearing because of death . . . ." I.R.E. 804(a).

Here, the challenged testimony is from witnesses who testified in the first trial but died before the second trial. Because they are deceased, these witnesses were clearly unavailable under Rule 804(a) "to be present or to testify" at the second trial. Further, because the testimony was given in the first trial for the same charges, the defense "had an opportunity and similar motive to develop the testimony" as required by Rule 804(b)(1). The relevance of the challenged testimony is not disputed. Thus, because the witnesses were unavailable and because the testimony was "given as a witness at another hearing of the same or a different proceeding . . . [and] the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" the testimony was admissible under Idaho Rule of Evidence 804. Accordingly, because the testimony was admissible under the Idaho Rules of Evidence, Lankford's reliance on Idaho Code section 19-2405 is misplaced. *State v. Howard*, 150 Idaho 471, 477, 248 P.3d 722, 728 (2011) ("To the extent that this statute attempts to prescribe the admissibility of hearsay evidence and is in conflict with the Idaho Rules of Evidence, it is of no force or effect." (citations and internal quotation marks omitted)). This Court has unequivocally held that "[t]he testimony of a deceased witness, given at a former trial, may be read as evidence at a subsequent trial between the same

15

parties and involving the same issues." *State v. Johnston*, 62 Idaho 601, 612, 133 P.2d 809, 814 (1941). Idaho Code section 19-2405 does not provide a basis for departing from this rule and the district court did not abuse its discretion by permitting testimony from the first trial to be read into the record in the second trial.

3. <u>Whether Idaho Code section 19-2405 prevented the district court from referring to the previous trial</u>

Lankford also argues that the district court's mention of a prior trial during voir dire violated Idaho Code section 19-2405 and requires a new trial. The statute provides, in pertinent part, that "the former verdict cannot be used or referred to either in evidence or in argument." As discussed above, the district court did not refer to a prior verdict. See Part II.A.3, *supra*. Rather, the district court only referred to a previous trial and appeal. A reference to a "previous trial" during voir dire does not violate section 19-2405. *See State v. Watkins*, 152 Idaho 764, 766, 274 P.3d 1279, 1281 (Ct. App. 2012) ("We are not persuaded that [the mention of a prior trial] is equivalent to the disclosure that a previous jury had found him guilty.").

**D. Lankford is entitled to a new trial due to prosecutorial misconduct.**

Lankford alleges multiple instances of prosecutorial misconduct which he contends warrants a new trial. Lankford alleges that the prosecutor: (1) elicited improper testimony from witnesses about Lankford's prior bad acts and conviction; (2) improperly called Lankford a liar and vouched for his own witnesses during closing statements; and (3) suppressed exculpatory evidence in violation of *Brady*[4] and *Napue*.[5] In addition, Lankford argues that even if no single instance of misconduct warrants a new trial, the cumulative effect of the misconduct does.

In its initial appellate briefing, the State addressed the substantive issues presented by Lankford's claim of prosecutorial misconduct. In its briefing in support of the petition for rehearing, the State observes that Lankford raised his *Brady* and *Napue* claims by way of a motion for new trial and vigorously argues that such claims may not be raised under Idaho Code section 19-2406. Indeed, this Court has "consistently recognized" that the grounds enumerated in the statute are the exclusive grounds upon which a defendant's motion for new trial may be granted. *State v. Page*, 135 Idaho 214, 223, 16 P.3d 890, 899 (2000). Likewise, we have held that

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).
[5] *Napue v. Illinois*, 360 U.S. 264 (1959).

Idaho Criminal Rule 34[6] "does not provide and independent ground for a new trial." *State v. Cantu*, 129 Idaho 673, 675, 931 P.2d 1191, 1193 (1997). Accordingly, we have repeatedly stated that prosecutorial misconduct is not a basis for granting a motion for new trial under Idaho Code section 19-2406. *See State v. Christiansen*, 144 Idaho 463, 469, 163 P.3d 1175, 1181 (2007); *Page,* 135 Idaho at 223, 16 P.3d at 899; *State v. Jones,* 127 Idaho 478, 481, 903 P.2d 67, 70 (1995).

Although a defendant's motion for new trial may not rest upon claims of prosecutorial misconduct, we regularly review such claims on direct appeal to determine whether the judgment should be vacated and a new trial granted. *See, e.g., State v. Parker*, 157 Idaho 132, 334 P.3d 806 (2014). As this is the direct appeal from Lankford's judgment, we will consider his claims of prosecutorial misconduct.

1. Standard of Review

 "Where prosecutorial misconduct was not objected to during trial, this Court may only reverse when that misconduct constitutes a fundamental error." *State v. Adamcik*, 152 Idaho 445, 480, 272 P.3d 417, 452 (2012) (citing *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010)). "Where a defendant demonstrates that prosecutorial misconduct has occurred, and such misconduct was followed by a contemporaneous objection by defense counsel, such error shall be reviewed for harmless error . . . ." *Perry*, 150 Idaho at 227, 245 P.3d at 979. Fundamental error is error that: "(1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless." *Id.* at 228, 245 P.3d at 980. An error is harmless when it is shown beyond a reasonable doubt that the error did not contribute to the jury's verdict. *Id.* at 227, 245 P.3d at 979.

2. Analysis

The first step in considering Lankford's claim that the State engaged in prosecutorial misconduct is to determine whether the alleged conduct actually rises to the level of

---

[6] Idaho Criminal Rule 34 presently provides that, upon motion of the defendant, the trial court "may grant a new trial to the defendant if required in the interest of justice." The rule has been amended, effective July 1, 2017. The new rule eliminates the reference to "the interest of justice" and simply provides that "[o]n the defendant's motion, the court may vacate any judgment and grant a new trial on any ground permitted by statute." I.C.R. 34(a) (2017).

prosecutorial misconduct. "Where a prosecutor attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence, this impacts a defendant's Fourteenth Amendment right to a fair trial." *Id*. It is the prosecutor's duty to "see that a defendant has a fair trial, and that nothing but competent evidence is submitted to the jury. [Prosecutors] should not exert their skill and ingenuity to see how far they can trespass upon the verge of error, because generally in so doing they transgress upon the rights of the accused." *Christiansen*, 144 Idaho at 469, 162 P.3d at 1181 (citations omitted). "However, in reviewing allegations of prosecutorial misconduct the Court must keep in mind the realities of trial. A fair trial is not necessarily a perfect trial." *State v. Ellington*, 151 Idaho 53, 62, 253 P.3d 727, 736 (2011) (citation omitted).

a. Whether testimony from witnesses about Lankford's prior trial, prior crimes and bad acts, prior incarceration, and prior death sentence was improperly elicited by the prosecutor

The district court made a pretrial ruling in which the court ruled that evidence of Lankford's "prior conviction, prior charges, [and] prior incarceration, are not admissible." Lankford argues that the prosecutor violated this ruling when questioning Lane Thomas (Thomas) and Bryan by eliciting testimony about Lankford's prior trial, conviction, crimes and bad acts, incarceration, and death sentence. In response, the State argues that the testimony was not intentionally elicited by the prosecutor but was volunteered by the witnesses and therefore was not prosecutorial misconduct.

We have held that a violation of a district court's ruling regarding the admissibility of evidence constitutes prosecutorial misconduct. *State v. Field*, 144 Idaho 559, 572, 165 P.3d 273, 286 (2007). This is true even when the prosecutor does not directly violate the ruling but attempts to "skirt around the district court's ruling." *Parker*, 157 Idaho at 144, 334 P.3d at 818.

We initially observe that the district court did not prohibit reference to Lankford's prior trial. Indeed, as discussed previously in Part II.A, the district court itself referred to the previous trial, as did defense counsel. Thus, the references to the prior trial complained of by Lankford, for the reasons stated earlier, were neither misconduct nor error. Part II.A, *supra*.

i. Thomas' Testimony

Lankford's first complaint relates to the prosecutor's questioning of Thomas. Thomas shared a unit with Lankford in the Latah County Jail. Thomas testified that Lankford confessed

to the murders over a period of three or four days while they played dominoes. Thomas further testified that he did not approach the State about testifying, but that the State approached him after one of the correctional officers overheard Thomas telling his girlfriend about Lankford's confession during a monitored telephone call. While laying foundation for Thomas' testimony, the prosecutor asked Thomas:

> Q: Did [Lankford] ever tell you what he was in for?
> A: Yes.
> Q: And did he ever talk about the charges?
> A: Yes.
> Q: What did he say about them?
> A: He said that he was in -- he's been on death row for 23 years for two murders, and that was committed in Grangeville.

Although the prosecutor's question about the charges ("What did he say about them?") can be viewed as calculated to elicit a response about the nature of the prior charges against Lankford, we are unable to conclude that the question sought an answer reflecting the outcome of the earlier charges. Stated differently, asking Thomas what Lankford had said about the charges against him cannot be interpreted as asking Thomas what Lankford had said about the earlier outcome of the charges against him. We are unable to conclude that Thomas' statement was the product of prosecutorial misconduct..

ii. Bryan's Testimony

Lankford next contends that the prosecutor engaged in misconduct when questioning Bryan about a camera Lankford sold to his brother Robert, what Bryan and Lankford did when they got to Sheep Creek Campground, why Bryan left Texas, and why Bryan changed his story while in prison.

When questioning Bryan about the camera that Lankford sold to his brother, the prosecutor asked:

> Q: Did you get any money from that purchase?
> A: I didn't know for sure that it was actually ever -- money transpired. I thought maybe he might have just ultimately gave it to him for some drugs or something, because I remember drugs involved in it.
> [Defense Counsel]: Your Honor, I'm going to object, and move to strike.
> The Court: I will -- that is not responsive. I will instruct you to disregard that, ladies and gentlemen, about the drugs.

The prosecutor's questioning of Bryan regarding what he and Lankford did once they got to Sheep Creek proceeded as follows:

Q: What did you and Mark do when you got to that camp?
A: We had -- before we got to the camp we had stopped and sat on a big rock on the river. And we had talked about this, because he wanted to steal the car. I was opposed to stealing the car. I should[] have been more adamant about it but obviously I wasn't. We were a little inebriated, too, by the way. We were drinking from the canteen which was -- I think it was Jack Daniels in the canteen. But anyway that notwithstanding we still talked there and then ultimately I agreed to help be a watchout because he had stolen cars before and I had never stolen a car so --.

The prosecutor's examination of Bryan about why he left Texas:

Q: Bryan, did there come a time in 1983 when you left Texas?
A: Yes.
Q: Why?
A: I left myself because I was on probation, and I had got a ticket because I was drinking. Friend of mine, and because I was on probation I talked to my probation officer who was brand new, and he said I was going to go to prison. So I was scared of prison because what [Lankford] told me about prison, where he had been.

When Bryan was discussing why he changed his story while in prison:

A: . . . I've said several different stories to try to survive in prison . . . I changed my story because I thought I was going to be killed or what have you.
Q: By who?
A: No. I'm saying that's not the only reason I changed it.
Q: I know, but you said you thought that you would be killed. And I asked by who?
A: Oh, by the gang members or friends of [Lankford]. That's a serious business in prison.
. . . .
Q: Did you ever talk to [Lankford] about any of your other statements?
A: Oh sure.
Q: And prior to making them?
A: Oh, yes. We were on death row together for a long time.

Bryan's testimony about the drugs, the prior car thefts, and prior incarcerations do not appear to have been intentionally elicited by the prosecutor. Nonetheless, we have held that "a prosecutor must 'guard against anything that would prejudice the minds of the jurors, and tend to hinder them from considering only the evidence introduced.' A prosecutor must also ensure that the jury receives only competent evidence." *State v. Severson*, 147 Idaho 694, 715, 215 P.3d 414, 435 (2009) (citations omitted) (quoting *State v. Irwin*, 9 Idaho 35, 44, 71 P. 608, 611 (1903)). In *State v. Ellington*, we stated that a police officer's "gratuitous and prejudicial response is imputed to the State, whether or not the State intended to elicit that response." 151 Idaho 53, 67,

20

253 P.3d 727, 741 (2011). In so doing we noted that the officer's response to the question was "completely unsolicited and wholly unnecessary." The same can be said here of Bryan's responses. While it is true that Bryan is not a police officer or an officer of the State, the prosecutor had the duty to ensure that Bryan provided only competent evidence. Bryan's statements about drugs, stolen cars, and Lankford's prison gang affiliation were improper and inadmissible and were clearly prejudicial. While a prosecutor certainly cannot be held responsible for every remark a witness might make, under the facts of this case—where the outcome of the trial turned solely on the credibility of the witnesses—presenting such prejudicial evidence could have potentially affected the outcome of the trial. It was incumbent upon the prosecutor to conform to the pretrial ruling precluding much of this inadmissible evidence and to instruct the State's witnesses to avoid mention of the prohibited evidence.

   b. <u>Whether the prosecutor's misconduct regarding Bryan's testimony requires the judgment to be vacated</u>

Having determined that some of the prosecutor's questioning of Bryan constituted misconduct, we now consider whether such conduct requires the judgment to be vacated. The statement by Bryan about drugs was objected to by the defense but the remaining statements by Bryan were not objected to. Thus, the testimony about drugs is reviewed for harmless error and the remaining statements are reviewed for fundamental error. *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010).

Immediately following Bryan's statement about drugs being exchanged for the camera, defense counsel objected and the district court sustained the objection stating: "[T]hat is not responsive. I will instruct you to disregard that, ladies and gentlemen, about the drugs." There is no evidence to suggest that the jury did not follow this instruction. Therefore, although the statement was improper, because the district court sustained the objection and instructed the jury to disregard the statement we are satisfied that the statement did not affect the outcome of the trial. *State v. Urie*, 92 Idaho 71, 74, 437 P.2d 24, 27 (1968) ("[I]n Idaho an error in admission of evidence may be cured by a proper instruction, and it must be presumed that the jury obeyed the trial court's instruction to disregard entirely the objectionable testimony.").

The prosecutor's remaining questions and the witnesses' responses were not objected to and are reviewed for fundamental error. "We have stated that 'where . . . the asserted error relates not to infringement upon a constitutional right, but to violation of a rule or statute . . . the fundamental error doctrine is not invoked.' " *Perry*, 150 Idaho at 226, 245 P.3d at 978 (quoting

21

*State v. Kirkwood*, 111 Idaho 623, 626, 726 P.2d 735, 738 (1986) (internal quotation marks around "fundamental error" omitted)). "Nowhere in *Perry* did this Court suggest that erroneous introduction of evidence 'violates a defendant's constitutional right to a jury trial.' " *State v. Dunlap*, 155 Idaho 345, 370, 313 P.3d 1, 26 (2013). Rather, evidentiary errors "do not implicate constitutional considerations unless 'the error results in the defendant being deprived [of] his or her Fourteenth Amendment due process right to a fair trial in a fair tribunal.' " *Id.* (alteration in original) (quoting *State v. Jones*, 154 Idaho 412, 417, 299 P.3d 219, 224 (2013)). Here, although the prosecutor's conduct violated the district court's evidentiary ruling, it did not affect Lankford's Fourteenth Amendment due process right to a fair trial. Thus, the first *Perry* element is not met and Lankford has failed to establish fundamental error.

      c.   <u>Whether the prosecutor's statements in closing argument constituted misconduct</u>

Lankford contends that the prosecuting attorney committed misconduct during his closing argument by vouching for the credibility of the State's witnesses and by calling Lankford a liar. Lankford also insists that the prosecutor engaged in misconduct in his rebuttal argument. The State asserts that Lankford has not established prosecutorial misconduct, and that even if there was misconduct, Lankford has failed to show that such misconduct rose to the level of fundamental error.

Lankford did not object to any of the statements he now seeks to challenge. We review unobjected to errors for fundamental error. *Perry*, 150 Idaho at 226, 245 P.3d at 978. "Whether comments during closing arguments rise to the level of fundamental error is a question that must be analyzed in the context of the trial as a whole." *State v. Carson*, 151 Idaho 713, 718–19, 264 P.3d 54, 59–60 (2011). "Prosecutorial misconduct during closing arguments will constitute fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *State v. Parker*, 157 Idaho 132, 146, 334 P.3d 806, 820 (2014). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

      i.   <u>Vouching Statements</u>

22

"Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness' veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). However, prosecutors may "argue reasonable inferences based on the evidence, including that one of the two sides is lying. Furthermore, prosecutors are permitted to respond to defense counsel's attempts to impeach the credibility of government witnesses." *United States v. Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011). (citations and internal quotation marks omitted). As we stated in *State v. Dunlap*:

> There is [] considerable latitude in closing argument, and both sides are entitled to discuss fully, from their respective standpoints, the evidence and the inferences that should be drawn from it. Unlike an opening statement, in a closing argument, the parties are entitled to explain how, from their own perspectives, the evidence confirms or calls into doubt the credibility of particular witnesses. However, the prosecutor may not express a personal belief as to the credibility of witnesses, unless the comment is based solely on inferences from evidence presented at trial, nor make personal attacks on defense counsel . . . .

155 Idaho 345, 369, 313 P.3d 1, 25 (2013) (citations and internal quotation marks omitted).

The comments which Lankford contends constituted improper vouching are emphasized and shown below in the context in which they occurred:

- If you remember when he got the ride from Darrel Cox he said that -- Darrel Cox said that Mark Lankford told him that his family had come camping to Idaho with him and that he needed a ride to McAlister Campground and that he was going to meet his family at McAlister Campground. Why would Mark Lankford lie about that? It doesn't make any sense. It shows that he's a liar. And as we go through these different things you will see a pattern here. You will see that Mark Lankford is a liar. *Now, Darrel Cox had no reason to make that up. He had no reason to lie today. He was inconvenienced, I'm sure, to come in and be a witness in this case, but he told the truth.*
- Again, the defense when they first talked to you said we were going to show you all these lies and deceptions. *We've shown you good people that have come up and been honest.* We've shown you good evidence, overwhelming evidence. And now the tables are turned.
- *Lane Thomas, basically with his life on the line, came in and testified in front of you. He had no reason to lie. He did not get a plea bargain from the State.* The only thing that we agreed to do was write a letter of cooperation that if he testified I would write a letter saying he came in and told the truth. And that I would submit that to the Judge on his case and to the prison facility in Cottonwood, which is a six-month prison facility where he's serving what they call a rider program.

23

- That overwhelming evidence is, one, the testimony of Lane Thomas that puts Mark Lankford there. A credible person that puts him there. Mark Lankford's confession to him.
- I'd ask you to think about Lane Thomas' testimony. I think we had a person there that didn't want to be here. He said -- he said he didn't want to be here. He said that his life had been threatened by Mr. Lankford and that his life had been Hell since he got involved in this case. *Yet, even facing that he came in and testified for nothing, nothing except a letter. And I submit that he told the truth* about Mark Lankford's confession to him, about him being there with Bryan Lankford and participating in these murders.

Here, the statement about Cox being inconvenienced and telling the truth is vouching. There is no evidence to support the assertion by the prosecutor that Cox "was inconvenienced, I'm sure, to come in and be a witness in this case, but he told the truth." However, this vouching was harmless because defense counsel told the jury that "[t]here's no reason to disbelieve what Mr. Cox says." Further, vouching statements, although constituting prosecutorial misconduct, do not constitute a clear constitutional violation. *Dunlap*, 155 Idaho at 370, 313 P.3d at 26 (citing *Perry*, 150 Idaho at 229, 245 P.3d at 981). The statement regarding Cox does not rise to the level of fundamental error.

The remaining statements about the truthfulness of the State's witnesses including the general statement "We've shown you good people that have come up and been honest" and the specific statements about Thomas' truthfulness are not vouching because defense counsel opened the door to discussion of the State's witnesses' veracity. Defense counsel asserted the following in his opening statement: "You're going to find that a lot of the testimony that they're going to have from witnesses in this case is going to be based on deception, and some of the witnesses in this case are going to speculate. So, the State's case is based on lies, deception, and speculation." Having opened the door to the subject of the veracity of the State's witnesses, the defense "should not be surprised to see the prosecutor enter." *United States v. Dorsey*, 677 F.3d 944, 954 (2012). Under these circumstances, the statement that the State has provided "good people that have come up and been honest" was not impermissible vouching.

This is likewise the case for the prosecutor's statements about Thomas' veracity. During cross-examination, defense counsel asked Thomas whether he was getting anything from the State in exchange for his testimony. Defense counsel implied that Thomas was a liar and attempted to impeach him by showing that Thomas had previously lied about what he heard Lankford say about the murders:

24

Q: "And do you remember making – telling advising Mr. Schoonover that what you had told Mr. Renshaw -- or, excuse me, Ms. Renshaw and Mr. Mealer was a lie?
A: I told him that out of fear.
. . . .
Q: So when you told Mr. Schoonover that you made it up, 'that it was all a fabrication in my own fucking mind that Mark had something to do with it,' that was a lie?
A: Everything I said to Mr. Schoonover was a lie."

In closing argument, defense counsel stated "[The prosecutor] didn't mention anything about what they were going to testify to, not anything about Robert, Lane [Thomas], Lee John, and Bryan. And you know why he didn't tell you in his opening statement what they were going to testify to? He didn't trust them. He didn't know what they were going to testify to. *He knew they were liars*." (emphasis added). Defense counsel argued that "Lane Thomas is an admitted liar" and "[Thomas] has a reputation for dishonesty, a reputation as a liar." Thus, because the defense opened the door regarding Thomas' veracity, the prosecutor's comments did not constitute improper vouching. *Wilkes*, 662 F.3d at 540 ("[S]tatements made by the prosecution do not constitute improper vouching where the argument that witnesses had no motive to lie is a permissible response to the defense counsel's earlier attacks on the witnesses' credibility.").

Furthermore, the prosecutor's argument that Thomas told the truth, testified for nothing more than a letter, did not get a plea bargain, and faced possible physical danger was not vouching because the statements were "based [] on inferences from evidence presented at trial" *Dunlap*, 155 Idaho at 369, 313 P.3d at 25. Both the prosecution and the defense asked Thomas what he would receive in exchange for his testimony. In response to both, he responded that he was not getting a plea bargain but only a letter. Thomas also testified that he faced possible physical retribution from Lankford for testifying. The prosecutor's statements did not reflect the prosecutor's personal belief about Thomas' truthfulness, but were inferences from the record. These statements were not impermissible vouching. *Id.*; *United States v. Necoechea*, 986 F.2d 1273, 1279 (9th Cir. 1993) (finding that "I submit" statements of truthfulness were not vouching but inferences from the record).

ii.    Liar/Lying Statements

The statements in which Lankford contends the prosecutor committed misconduct by calling Lankford a liar are as follows:

1. Mark Lankford testified in this case, and there was [sic] many lies that he told

25

you.

2. [Mark] Lied [sic] to Darrell Cox about where he was going and who he was going to meet.
3. It shows that he's a liar.
4. You will see Mark Lankford is a liar.
5. Well, Mark lied. He said, I don't know anything about any murders, and I don't know anything about any stolen van. That was a lie.
6. So he lied to you on the stand when he talked about the kind of money he had when he left Texas and when he came back from Texas.
7. He lied to Robert Lankford about the money he had when he left Texas.
8. He lied to Robert Lankford when he got back to Texas about why he left his car in Idaho.
9. He lied about that. He lied about having money when he left and when he returned.
10. He lied about going to the Frank Church River of No Return Wilderness.
11. He lied about having access to the hatchback door on the Camaro.
12. Again, another lie.
13. He lied about his use of the nightstick.
14. He basically lied about the circumstances of that nightstick.
15. He lied about having to use the restroom at McAlister [sic].
16. I find it strange that these people he allegedly says gave him an alibi defense have never been found. . . . I submit that there is nobody that gave him a ride, and that that's a made-up story. That's another of his lies.

We note that defense counsel initiated the theme in his opening statement by calling the State's witnesses liars and specifically calling Bryan a liar, stating:

You're going to find that a lot of the testimony that they're going to have from witnesses in this case is going to be based on deception, and some of the witnesses in this case are going to speculate. So, the State's case is based on lies, deception, and speculation. You're not going to know what Bryan Lankford is going to testify to until he actually gets upon on the stand. Bryan Lankford, by my count, has said at least 15 to 20 different times about what happened that night. Many times under oath in prior court proceedings, many times in sworn affidavits, many times in letters, many times in interviews with the police and the FBI agents. He's a liar, and when he testifies you're going to see that.

Further, Lankford himself admitted to lying at various points in the trial. Thus, although the repeated use of the term "liar" and its various grammatical forms is troubling and ill-advised, it did not rise to the level of prosecutorial misconduct. *State v. Gross*, 146 Idaho 15, 19, 189 P.3d 477, 481 (Ct. App. 2008) ("[T]he prosecutor's excessive use of the term "liar" is troubling but did not amount to misconduct given that [the defendant] placed his credibility in issue and admitted to lying in connection with the case."); *Portunodo v. Agard*, 529 U.S. 61, 69 (2000) ("The prosecutor's comments in this case [] concerned respondent's credibility as a witness, and

26

were therefore in accord with our longstanding rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness." (citations and internal quotation marks omitted)).

Moreover, the prosecutor's statements are supported by the evidence presented at trial. Lankford himself admitted to lying at various points during the trial. For example, when questioned about what he had told Darrell Cox, Lankford stated: "None of that was true." When asked about his statement to FBI Agent Dennis Ploeger about whether he lied about knowing anything about the Bravences' car, Lankford stated: "I didn't consider the van a car, but you could say it was a lie." Statements two through four, when taken in context, directly referenced Lankford's conversation with Cox and Lankford himself admitted in his testimony that he lied in his conversation with Cox. Statement 5 relates to Lankford's conversation with Special Agent Dennis Ploeger and Lankford admitted in his testimony that he lied to Agent Ploeger.

Statements six through nine refer to statements Lankford made to his brother Robert about his financial condition and why he didn't have his car anymore. In context, the prosecutor stated:

> He [Lankford] lied to Robert Lankford about the money he had when he left Texas. He testified he had a lot of money when he left Texas. That's not true. I think we've shown that. He claimed he had a lot of money when he returned to Texas. That's not true. How do we know that's not true? Well, he moved in with Roy Ralmuto. He didn't help with any groceries. He didn't help with any expenses. That was testified to. He moved in with Robert Lankford for six days. He didn't help with any expenses there. He didn't help with any groceries. So he lied to you on the stand when he talked about the kind of money he had when he left Texas and when he came back to Texas.
>
> He lied to Robert Lankford when he got back to Texas about why he left his car In Idaho. He told Robert Lankford his oil pan had been damaged, and it was inoperable and that he couldn't drive it out of Texas [sic]. He didn't say he robbed somebody. And he didn't say that this was somebody else's van that he had driven from Idaho to Texas. He didn't say anything about that to his brother – to his brother Robert. He lied about that. He lied about having money when he left and when he returned. I think we've already covered that.

The prosecutor's statements, when taken in context, are reasonable inferences based on evidence from the trial.

Statement ten addressed Lankford's claim about trying to go to the Frank Church River of No Return Wilderness. However, the prosecutor directed the jury's attention to evidence presented at trial in support of his assertion:

27

He lied about going to the Frank Church River of No Return Wilderness. As I remember his testimony he said that's where he was going to. That's where he was going to camp. Well, he wasn't anywhere near the Frank Church River of No Return Wilderness. You'll get a map that you can look at as to where he was camped on Summit Flats, and it's not -- Frank Church River of No Return Wilderness is not even on that map. So, he lied about that.

Statements eleven and twelve related to Lankford's access to the hatchback door. Once again, the prosecutor contrasted what Lankford said with the testimony of other witnesses in support of his claim that Lankford was lying:

He lied about having access to the hatchback door on the Camaro car. Rodger Laughlin, the ex-sheriff of Idaho County, and Jon Stoop, the ex-deputy sheriff who was the main investigator on the case, they testified that when they looked at that car it was completely covered. [Defense counsel] said in opening argument that it was partially covered. Well, you'll – you've seen the photographs. You'll [get] to look at them again. Extremely well covered with all kinds of branches and limbs on that car. And again, the testimony from Laughlin and Stroop was, you could not open that back hatchback door. Again another lie.

Statements thirteen and fourteen were about the use of a nightstick. Again, the prosecutor compared what Lankford had said about the nightstick with the testimony from other witnesses and inferred from the evidence that Lankford was a liar. Statement fifteen referred to Cox's testimony and, once again, the prosecution pointed to discrepancies between Cox's testimony and Lankford's testimony to support the conclusion that Lankford had lied. Finally, statement sixteen—that Lankford was lying about people having given him a ride—was based upon the lack of evidence supporting Lankford's alibi.

Because the prosecutor supported his assertions with evidence presented during the trial, the statements, although troubling, did not constitute misconduct.[7] *State v. Dunlap*, 155 Idaho 345, 369, 313 P.3d 1, 25 (2013) ("Unlike an opening statement, in a closing argument, the parties are entitled to explain how, from their own perspectives, the evidence confirms or calls into doubt the credibility of particular witnesses. However, the prosecutor may not express a personal belief as to the credibility of witnesses, unless the comment is based solely on inferences from evidence presented at trial." (citations and internal quotation marks omitted)).

Finally, even if these statements were prosecutorial misconduct, they did not rise to the level of fundamental error. "Prosecutorial misconduct during closing arguments will constitute

---

[7] We are perplexed why the talented prosecutors of this State continue to choose to use the word "liar" and risk appeal or reversal. There are so many other powerful verbal techniques that can be used to convey the same concept to jurors.

fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *State v. Parker*, 157 Idaho 132, 146, 334 P.3d 806, 820 (2014). Here, the court explicitly informed the jury that comments during closing statements were not to be considered as evidence. Instruction twenty-seven stated: "The arguments and statements of the attorneys are not evidence. If you remember the facts differently from the way the attorneys have stated them, you should base your decision on what you remember." "We presume that the jury followed this instruction in reaching its verdict." *State v. Rawlings*, 159 Idaho 498, 506, 363 P.3d 339, 347 (2015). Given the context of the prosecutor's comments, we do not think they were so egregious or inflammatory that they would not have been cured by the court's instruction.

### iii. Whether statements in rebuttal constituted misconduct

In his rebuttal, the prosecutor laid out a detailed timeline in which he placed the time of the murders at approximately 8:30 p.m. Defense counsel objected to the 8:30 p.m. time because the prosecutor had previously stated in a pretrial hearing that the murders occurred at 9:00 or 9:15 p.m. The district court overruled the objection. Lankford now contends that the prosecutor committed misconduct by misrepresenting the time the murders occurred and that the district court erred in overruling the objection. The State responds that they were not bound by their earlier representation that the murders occurred at 9:00 or 9:15 p.m. and that even if it was misconduct it was harmless.

"Where a defendant demonstrates that prosecutorial misconduct has occurred, and such misconduct was followed by a contemporaneous objection by defense counsel, such error shall be reviewed for harmless error . . . ." *Perry*, 150 Idaho at 227, 245 P.3d at 979. An error is harmless when it is shown beyond a reasonable doubt that the error did not contribute to the jury's verdict. *Id*. "It is improper to misrepresent or mischaracterize the evidence in closing argument." *State v. Rothwell*, 154 Idaho 125, 133, 294 P.3d 1137, 1145 (Ct. App. 2013). "Indeed, the prosecutor has a duty to avoid misrepresentation of the facts and unnecessarily inflammatory tactics." *State v. Moses*, 156 Idaho 855, 871, 332 P.3d 767, 783 (2014).

In *Moses*, the prosecutor misled the jury as to the terms of a witness' immunity agreement. There, the prosecutor, although aware that an immunity agreement explicitly provided multiple penalties should the witness falsely testify, stated that the witness could not

get in trouble no matter what he said. *Id.* at 870–71, 332 P.3d at 782–83. We held that, because the prosecutor had a duty to avoid misrepresentation of the facts, the unqualified misstatement of the terms of the immunity agreement constituted misconduct. *Id.* However, we found that the misconduct was harmless. *Id.* at 871, 332 P.3d at 783.

This case does not present the same situation as *Moses*. Here, before the trial began, the prosecutor informed the court that the murders likely occurred around 9:00 or 9:15 p.m. on June 21, 1983, but his representation was far from a stipulation or an agreement to be bound to that time. The prosecutor stated that the murders took place on June 21, 1983, "basically . . . around dark, around 9:15, 9:00 in the evening. . . About 9:15 . . . at approximately 9:15 just at dark . . ." The prosecutor's representation that the murders occurred "basically around" "about" and "approximately" between 9:00 and 9:15 pm did not constitute a binding admission intended to conclusively establish that the murders occurred at those times. It was an approximation. The prosecutor was free to argue the time of the murders based upon the evidence presented at trial. Accordingly, the prosecutor's statement in rebuttal was not misconduct and the district court did not err by overruling the defense objection.

d. *Brady/Napue* Violations

Lankford contends that the prosecutors violated the requirements of *Brady v. Maryland*, 373 U.S. 87 (1963), by withholding material impeachment evidence regarding the deals the prosecutors made with Bryan and Thomas for their testimony and violated the rule of *Napue v. Illinois*, 360 U.S. 264 (1954), by failing to correct false testimony from Bryan and Thomas. Both of these claims were addressed by the district court in its Order on Motion for New Trial. The district court found that some of the *Brady* and *Napue* evidence brought forward by Lankford was "newly discovered." The district court found that "there was no reasonable probability of a different verdict if the prosecutor had timely disclosed his understanding with Thomas." The district court found that Bryan's failure "to testify about his access to a cell phone does not constitute perjury, as Bryan was never asked about such access.

At the outset, it is important to distinguish the difference between the standards governing a motion for new trial based upon newly discovered evidence established in *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976), and those applicable to *Brady* and *Napue* claims. A *Brady* claim is quite distinct from a request for a new trial based on newly discovered evidence. *Grube v. State*, 134 Idaho 24, 30–31, 995 P.2d 794, 800–01 (2000) (noting that the

*Drapeau* standard is a different and "higher standard" than what is required under *Brady*); *see also State v. Branigh*, 155 Idaho 404, 421–22, 313 P.3d 732, 749–50 (Ct. App. 2013). Under *Drapeau*, the defendant must show, among other things, that the newly discovered evidence "will probably produce an acquittal." *Drapeau*, 97 Idaho at 691, 551 P.2d at 978. Under *Brady*, the defendant must demonstrate that the government's suppression of evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). And under *Napue*, the defendant must show that the false testimony "could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Thus, the defendant's burden of proof under *Brady* and *Napue* is lower than that under *Drapeau*. *Grube*, 134 Idaho at 30–31, 995 P.2d at 800–01. This is because such claims derive from prosecutorial misconduct, whereas *Drapeau* claims deal with evidence that was unknown to the defendant not due to prosecutorial misconduct. *Compare Bagley*, 473 U.S. at 678–81 *with State v. Ellington*, 157 Idaho 480, 485, 337 P.3d 639, 644 (2014).

The State has a duty to disclose exculpatory evidence to a defendant. *Brady*, 373 U.S. at 87. This duty exists even in the absence of a request by the defendant, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and extends to impeachment evidence as well as exculpatory evidence. *Bagley*, 473 U.S. at 676. In order to establish a *Brady* violation, there must be evidence that (1) is favorable to the accused because it is either exculpatory or impeaching; (2) was willfully or inadvertently suppressed by the State; and (3) was prejudicial or material in that there is a reasonable probability that its disclosure to the accused would have led to a different result. *State v. Shackelford*, 150 Idaho 355, 380, 247 P.3d 582, 607 (2010) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Kyles*, 514 U.S. at 433). "Reasonable probability" of a different result is shown when the suppression "undermines confidence in the outcome of the trial." *Id.* (quoting *Kyles*, 514 U.S. at 433).

" '[A] conviction obtained through use of false evidence, known to be such by representatives of the State,' violates the Fourteenth Amendment, as do convictions obtained in proceedings where 'the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' " *State v. Dunlap*, 155 Idaho 345, 389, 313 P.3d 1, 45 (2013) (quoting *Napue*, 360 U.S. at 269). Thus, to establish a *Napue* violation a defendant must show "(1) the testimony was false; (2) the prosecutor should have known it was false; and (3) the testimony was material." *State v. Wheeler*, 149 Idaho 364, 368, 233 P.3d 1286, 1290 (Ct. App. 2010) (citing

*Hovery v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006)). Testimony is material when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bagley*, 473 U.S. at 678; *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005).

i.  Alleged *Brady* and *Napue* violations regarding Bryan's testimony

Lankford claims that the State violated *Brady* because it did not disclose the fact that the prosecutor: (1) arranged for Bryan to have a cell phone while in prison to call his wife; and (2) helped facilitate communication between Bryan and his brother, Lee John. Lankford contends that *Napue* was violated because when the prosecutor elicited Bryan's testimony explaining what Bryan was receiving in exchange for his testimony the prosecutor failed to mention the cell phone and facilitated communications. At a post-trial evidentiary hearing, one of the prosecutors testified that he agreed to Bryan having a cell phone while in prison so Bryan could contact his wife and that he facilitated communication between Bryan and his brother Lee John.

There is no doubt that the first two *Brady* and *Napue* requirements are met. The undisclosed cell phone privileges and the facilitated communications were relevant to impeach Bryan's credibility and therefore were favorable to Lankford. Additionally, the prosecutor knew about the cell phone access and the facilitated communications and he should have corrected Bryan's testimony to include mention of those items. All that remains, therefore, is to determine whether Lankford suffered prejudice under *Brady* or whether, under *Napue*, the failure to correct Bryan's testimony created a reasonable likelihood that the jury's judgment could have been affected.

Bryan was extensively examined about his different and conflicting statements. Indeed, Bryan himself stated that he "changed [his] story . . . [m]any times," to the extent that he could not "remember all the made up stories." When asked "How many versions of this story do you think you have made up?" Bryan responded, "probably about ten. It could be a couple of more, few less, but I would say about ten or more." Bryan admitted that in exchange for his testimony the prosecutor had promised to: (1) obtain a protection order so he would not have to go back to Boise; (2) attempt to get him transferred out of Idaho to a confidential location; (3) assist him in obtaining a name change; (4) assist in getting his parole hearing moved up by seven years; (5) write a letter to the Board of Pardons and Parole informing them of Bryan's cooperation; (6) give Bryan immunity from perjury charges for his prior contradictory testimony; and (7) appear, along with Detective Mealer, to testify at the parole hearing about Bryan's cooperation in

32

Lankford's case. In short, Bryan was thoroughly impeached at trial and we are convinced that the information regarding the cell phone access and the facilitated communications would not have affected the judgment of the jury nor does it undermine our confidence in the outcome of the trial. *See Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010) (holding that a witness was so "thoroughly impeached" that there was no reasonable likelihood that the *Brady* and *Napue* violations had any effect on the jury or the outcome of the trial).

ii.    Alleged *Brady* and *Napue* violations regarding Thomas' testimony

Lankford argues that the State committed two *Brady* violations in relationship to the testimony of Lane Thomas. They are characterized by Lankford as (1) the failure to disclose that the prosecutor had told Thomas about a month before the trial that he would try to get him out of prison and placed on probation; and (2) the failure to disclose that $1,500 was given to Thomas after the trial. Lankford also alleges that *Napue* was violated because the prosecutor failed to correct Thomas' testimony when Thomas stated that he was only testifying for a letter of cooperation and for "just being honest."

Initially we note that after carefully examining the record we find no evidence to support Lankford's assertion that the post-trial $1,500 payment made to Thomas by Idaho County was part of any pretrial agreement made between the prosecutors and Thomas in exchange for his testimony.[8] Therefore, our analysis focuses solely on Lankford's assertion that the prosecutors failed to disclose their promise to help Thomas get out of prison and placed on probation.

During the prosecutor's direct examination of Thomas, the following exchange took place:

---

[8] An evidentiary hearing was held regarding the promises Thomas received in exchange for his testimony and when he received them. Testimony from the hearing showed that Idaho County paid Thomas $1,500 on March 3, 2008, when he was released from prison and placed on probation. The money came from a check written to a detective involved in the case, who cashed the check and provided the proceeds to Thomas behind a carwash. One of the prosecutors testified that the payment to Thomas did not come up until Thomas' rider review hearing following Lankford's trial, that the payment was not part of any deal with Thomas, and was made only for Thomas' travel expenses to leave Idaho. The other prosecutor testified that he was unaware of the payment until late 2010 or early 2011. The district court found that all discussion about the decision to pay Thomas $1,500 occurred post-trial. Lankford does not point to any evidence to suggest that the agreement occurred beforehand but asserts that "it requires a healthy degree of faith and willful ignorance to believe the prosecutor's claim that [] the $1,500 [was] not part of [the] deal with [Thomas] in exchange for his testimony . . . ." A review of the record did not uncover any evidence that pointed to the discussions about the $1,500 occurring at any time pretrial. Indeed, Thomas' own attorney indicated that he thought it came up at Thomas' review hearing: "I believe – I know – well, I believe that I discussed funds for Lane [Thomas] to be able to move out of state with, I believe it was [one of Lankford's prosecutors], the day – the day of the hearing in [Thomas]'s case, or the day before." Although, as Lankford suggests, the payment of the $1,500 is certainly suspicious, we are unable to conclude that the district court's factual finding was clearly erroneous.

Q: The Prosecutor's Office was going to write a letter of cooperation for your testimony today?
A: Yes.
Q: And that they would send that to the North Idaho Correctional Institution at Cottonwood?
A: Yes.
Q: And that [they] would say that you cooperated with the investigation of the Mark Lankford case and testified truthfully?
A: Yes.

The prosecutor then asked: "Any other reason other than the letter that the Prosecutor's office will write that you're testifying today?" To which Thomas responded: "There's no reason but just being honest." This was the entirety of the evidence that the prosecutor offered at trial regarding the consideration extended to Thomas in exchange for his testimony. Defense counsel's cross-examination elicited only slightly more information, including the fact that Thomas was also given immunity from perjury charges and that Thomas hoped to be placed on probation.

At a post-trial evidentiary hearing, one of the prosecutors testified that he told Thomas before the trial that he would try to help Thomas "get out of the prison system" and "try to get him put on probation." In addition, the prosecutor testified that he told Thomas he "would talk to . . . the Latah County Prosecutor, to try to get him on probation." The prosecutors admitted that this information was not disclosed to the defense. Affirmative personal intervention with the Latah County Prosecutor to assist Thomas in getting out of prison and placed on probation is materially different than offering to write a letter to correctional authorities. Thomas' testimony to the jury that he was only getting a letter of cooperation was false and misleading.

This evidence satisfies the first *Brady* prong because it is significant impeachment evidence that suggests that Thomas had significant incentive to testify in a fashion favorable to the prosecution. It satisfies the second *Brady* prong because it was not disclosed to the defense. Because the testimony was false and, as evidenced by the prosecutors' testimony at the evidentiary hearing, the prosecutors should have recognized that it was false, the first two *Napue* elements are satisfied as well. Thus, the only remaining question is that of materiality.

As the Supreme Court of the United States has stated, "the [fundamental] question [of materiality] is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The

34

analysis of materiality is different for *Brady* and *Napue* claims. Under a *Brady* claim, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding *would* have been different" *United States v. Bagley*, 473 U.S. 667, 682 (1985) (emphasis added); *see also Kyles*, 514 U.S. at 433. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). For a *Napue* claim, evidence is material when "there is *any* reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Bagley*, 473 U.S. at 678 (emphasis added); *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005).

The State argues that the *Napue* and *Brady* violations were immaterial because Thomas had been impeached, the jury was aware that the prosecutors had agreed to write a letter of cooperation, and that Thomas had admitted on cross-examination that he wanted to be released on probation. The State argues that "there was no other reason to write a letter than to try and help Thomas secure probation and the details about contacting the prosecutor [ ] would not have helped Lankford and or changed the jury's understanding regarding the letter of cooperation."

The State also argues that because Thomas did not contact law enforcement regarding Lankford's admissions, but only came to their attention due to the monitored telephone call, strongly indicates that his testimony was truthful. Indeed, the district court found this argument to be compelling, stating:

> In large measure Thomas' credibility was and is supported by the circumstances under which his testimony was discovered, *i.e.* Thomas was overhead telling a girl friend of Lankford's disclosures. Thomas did not seek out the State to use this information to benefit himself. Thomas testified that he didn't want to be involved.

The district court's evaluation of Thomas' credibility is not entitled to the usual deference that we afford such determinations because the judge did not observe Thomas when he testified. *Shabinaw v. Brown*, 131 Idaho 747, 750–51, 963 P.2d 1184, 1187–88 (1998); *Nafus v. Campbell*, 96 Idaho 366, 368, 529 P.2d 266, 268 (1974); *Van Camp v. Emery*, 13 Idaho 202, 207, 89 P. 752, 754 (1907). Instead, we freely review the same evidence that the district court considered evidence. Having done so, we reach a different conclusion.

The State underestimates the value of a prosecutor's correction of Thomas' testimony and the disclosure of the true extent of the prosecutors' efforts in securing Thomas' release from prison could have had. There is a dramatic difference between writing a letter stating that

35

Thomas had cooperated and personally contacting the Latah County Prosecutor to lobby for Thomas' early release. In fact, the prosecutors did much more than simply write a letter to correctional authorities. One of the prosecutors testified that they met with the Latah County Prosecutor before Lankford's trial to request that the prosecutor be "liberal with regard to the time [Thomas] had to serve." The other prosecutor testified at the post-trial evidentiary hearing: "At some point after the trial, I contacted [the Latah County Prosecutor] . . . . And I recommended to [him] that . . . if there was anything that [he] could do to keep Lane [Thomas] out of prison right now and have him on probation -- a felony probation, you know, I would appreciate that."[9] Although Thomas was cross-examined about how he hoped to benefit from his cooperation, evidence of an explicit prosecutorial promise to help Thomas get out of prison and placed on probation likely would have carried far greater weight than any benefit the jury might have perceived that he would receive from a simple letter. Such evidence would have demonstrated motive to provide testimony aiding the prosecution well beyond that of Thomas' claimed motive of "just being honest."

Although some of the facts presented in Thomas' testimony were corroborated by other witnesses and by physical evidence, those facts pale in significance when compared to Thomas' testimony that Lankford intended to rob the Bravences before they were killed. The district court properly instructed the jury that to find Lankford guilty of felony murder the jury had to find that Lankford "intended to commit the act of robbery against the persons of Robert and/or Cheryl Bravence . . . prior to the commission of the homicide(s)." Bryan and Thomas were the only witnesses who testified that Lankford had the required intent to rob the Bravences before they were killed.

Thomas' credibility as a witness was essential to Lankford's conviction. Without Thomas' testimony corroborating Bryan's testimony, the State had little to no hope of securing Lankford's conviction. I.C. § 19-2117; *State v. Stone*, 147 Idaho 890, 891, 216 P.3d 648, 649 (Ct. App. 2009) ("[the] corroboration requirement is intended to protect against the danger that an accomplice may wholly fabricate testimony, incriminating an innocent defendant in order to

---

[9] The jury returned its verdict on February 13, 2008. Shortly thereafter, Lankford's prosecutors contacted the Latah County Prosecutor about getting Thomas out on probation. The Latah County Prosecutor testified that he met with Thomas' lawyer and the judge on Thomas' case in chambers and it was decided that Thomas would be released from his rider program early. Thomas' rider review hearing was held on February 28, 2008, a full three months before it would have otherwise occurred. Thomas was released from prison on probation on March 3, 2008, less than one month after the jury returned its guilty verdict in Lankford's case.

win more favorable treatment for the accomplice."). The critical importance of Thomas' testimony was underscored by the district court when it ruled on Lankford's motion for acquittal: "If it were just Bryan Lankford this would be a lot tougher decision. But with the testimony of Lane Thomas I find it much easier to deny the motion." Thomas' account of events, which he claimed to have learned from Lankford, corroborated Bryan's version of events.

As this case hinged on Thomas' credibility, we conclude that there is a "reasonable likelihood" that Thomas' false testimony about his motive for testifying "*could* have affected the judgment of the jury." The prosecutor's failure to disclose the full details of the agreement "undermines our confidence in the outcome of the trial," such that we cannot be sure the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Therefore, we hold that Lankford's right to a fair trial was violated and that he is entitled to a new trial.

Because we find that Lankford is entitled to a new trial we do not address the issues of cumulative error or Lankford's Rule 35 motion.

### III. CONCLUSION

For the forgoing reasons, we vacate the judgment of conviction and remand for a new trial.

Justices EISMANN and JONES, **CONCUR**.

BURDICK, Chief Justice, dissenting.

I dissent because I am unable to agree with the Majority's conclusion that the prosecutors violated *Brady* and *Napue* by not disclosing every minute detail about their promises to help Thomas get out of prison and placed on probation. The Majority concludes that the prosecutors failed to disclose the full details about their agreement with Thomas in exchange for his testimony and this failure "undermines our confidence in the outcome of the trial." However, I believe the details of the agreement were adequately disclosed, and that any additional details about what was agreed to by the prosecutors and Thomas was merely cumulative impeachment evidence that would not have affected the judgment of the jury.

At a post-trial evidentiary hearing one of the prosecutors was questioned about his pre-trial conversations regarding what Thomas would receive in exchange for testifying in Lankford's case:

Q: [W]hat was your understanding of what Lane Thomas would get in exchange --
A: Well, first of all, Lane never asked me for anything.
Q: Did -- let me follow up on that. Did you ever negotiate directly with Lane?
A: I -- believe -- you know, again, let me say, he never asked for anything. I think at one point when I was talking to him -- and I don't know -- I don't know for sure when that was. It would have been before trial.

And I -- I told him -- and, again, he didn't ask for this. But I said, if you're going to put your life on the line and testify against Mark, I would be willing to talk to the Latah County Prosecutor. Because at that time, I believe -- when I talked to him at that point, he was doing a rider at Cottonwood, and I was fearful for his safety.

And what I told him in that conversation was, you know, I will try and -- try and get you out of the prison system. He was on a -- not -- you know, he wasn't in Boise doing hard time; he was doing a rider. And, basically, I told him I would help him, if I could. And I -- I couldn't promise him any results, but I said I would try to get him put on probation.

It is clear from the prosecutor's testimony that although Thomas did not ask for anything, in essence, the prosecutor offered to help Thomas get out prison and placed on probation. This underlying assertion, that the prosecutor would attempt to help Thomas get out on probation, is essentially what was disclosed at trial.

On direct examination of Thomas the following exchange took place between the prosecutor and Thomas:

Q: The Prosecutor's Office was going to write a letter of cooperation for your testimony today?
A: Yes.
Q: And that they would send that to the North Idaho Correctional Institution in Cottonwood?
A: Yes.
Q: And that that would say that you cooperated with the investigation of the Mark Lankford case and testified truthfully?
A: Yes.

Then on cross-examination defense counsel asked about Thomas' current sentence and what Thomas hoped would happen after testifying in the Lankford case:

Q: And you want to better yourself on this rider or retained jurisdiction program, correct, so you can be placed on probation when you come back for a rider review hearing, correct?

38

A: Yes, sir.
Q: And it's your hope to be placed on probation at the end of this right?
A: Yes, sir.

From these two exchanges it is clear that the prosecution agreed to support Thomas by writing a letter and that Thomas believed his cooperation in Lankford's case would help him secure a release from prison and placement on probation. Accordingly, the jury was perfectly aware that the prosecutors were going to be involved in securing probation for Thomas. The Majority makes much of the fact that during the trial Thomas only testified to a letter being written on Thomas' behalf and not to the prosecutor's pre-trial statements that the prosecutor would try to help Thomas get out on probation by personally talking to the Latah County prosecutor. Evidence of the latter, the Majority concludes, would so further impeach Thomas to the jury that the Majority's confidence in the verdict is undermined. However, Thomas was already impeached by evidence of the letter of cooperation, which the jury had been informed was intended to help Thomas get placed on probation, and thus, the principal component of the agreement between Thomas and the prosecutors was readily evident to the jury: By testifying in Lankford's case, Thomas hoped to get out of prison and placed on probation, and the prosecutors had agreed to assist Thomas in his desire to do so. Any additional evidence of the prosecutors' agreement to help Thomas get out on probation was merely cumulative to the jury's awareness that the prosecutors had agreed to support Thomas in his desire to be placed on probation. In my view, such cumulative impeachment evidence, without more, is insufficient to undermine confidence in the verdict to the extent that a new trial is warranted. *See, e.g.*, *State v. Martinez*, 125 Idaho 445, 452, 872 P.2d 708, 715 (1994) ("Evidence which is merely cumulative or impeaching is not a sufficient basis for the grant of a new trial."); *U.S. v. Marashi*, 913 F.2d 724, 732 (1990) ("[C]umulative impeachment evidence [is] not *Brady* material."). Therefore, because the Majority's sole reason for granting a new trial was based on what I view to be merely cumulative impeachment evidence I would affirm the district court.

Justice BRODY CONCURS.